*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| PAYTON S. and EFFIE B., | ) | |
| | ) | Supreme Court Nos. S-15581/15585 |
| Appellants, | ) | |
| | ) | Superior Court Nos. 4BE-10-00046/ |
| v. | ) | 00047 CN and 4BE-13-00011 CN |
| | ) | |
| STATE OF ALASKA, | ) | O P I N I O N |
| DEPARTMENT OF HEALTH AND | ) | |
| SOCIAL SERVICES, OFFICE OF | ) | No. 7004 - May 1, 2015 |
| CHILDREN'S SERVICES, | ) | |
| | ) | |
| Appellee. | ) | |
| | ) | |

Appeal from the Superior Court of the State of Alaska, Fourth Judicial District, Bethel, Dwayne W. McConnell, Judge.

Appearances: Hanley Robinson, Assistant Public Defender, Anchorage, and Quinlan Steiner, Public Defender, Anchorage, for Appellant Payton S. Whitney A. Power, Power & Brown, LLC, Bethel, for Appellant Effie B. David T. Jones, Senior Assistant Attorney General, Anchorage, and Michael C. Geraghty, Attorney General, Juneau, for Appellee.

Before: Fabe, Chief Justice, Winfree, Maassen, and Bolger, Justices. [Stowers, Justice, not participating.]

MAASSEN, Justice.

## I. INTRODUCTION

The Office of Children's Services (OCS) took custody of two young girls because of their parents' substance abuse and neglect. OCS took custody of the parents' son shortly after his birth for the same reasons. The trial court terminated the parents' rights to all three children, who are Indian children as defined by the Indian Child Welfare Act (ICWA).[1]

The parents appeal. They argue that the trial court violated due process when it entered an adjudication and disposition order on the basis of OCS's offer of proof before the parents had received proper notice or been appointed counsel. They also argue that the trial court erred at the termination trial when it found that (1) the children were in need of aid; (2) the parents failed to timely remedy the conduct or conditions that placed the children at risk of harm; (3) OCS's expert witnesses qualified as experts for purposes of ICWA; (4) the parents' continued custody of the children would likely result in serious emotional or physical harm to the children; and (5) termination of parental rights was in the children's best interests. We affirm, concluding that the lack of proper notice at the adjudication and disposition stage did not affect the outcome of this proceeding (and therefore did not deprive the parents of due process) and that the trial court's decision at the termination stage was supported by the evidence.

---

[1]     25 U.S.C. § 1903(4) (2012).

## II. FACTS AND PROCEEDINGS

### A. OCS's Involvement With The Family; Pretrial Proceedings

This case involves Payton and Effie and three of their children: Adelaide, born in 2007; Angelica, born in 2009; and Payton Jr., born in 2013.[2] Both parents have histories of alcohol abuse. OCS employee Venissa Wynn went to the family home in August 2010 to investigate a report that the two girls were home with Payton and another man, who were both intoxicated, while Effie "was nowhere to be found." OCS took custody of the children for the night. When Wynn returned the next day, Payton was intoxicated again. Effie was home, but she told Wynn that "she just came home to wash her hair and change her clothes, and she was leaving again," and she asked if OCS could keep the children another day.

OCS filed an emergency petition asking that the trial court adjudicate Adelaide and Angelica as children in need of aid under AS 47.10.011(1) (abandonment), (9) (neglect), and (10) (substance abuse).[3] OCS had difficulty maintaining contact with the parents during the months that followed, and they were not served with a copy of the petition until the day of the combined adjudication and disposition hearing, November 4,

---

[2] The parents also have an older daughter, Kiersten, who has been culturally adopted by her maternal grandmother Xandy. We use pseudonyms to protect the privacy of the parties.

[3] ICWA permits an Indian child's tribe to intervene in state court Child In Need of Aid (CINA) proceedings. 25 U.S.C. § 1911(c). Both the mother's tribe, Native Village of Eek, and the father's tribe, Native Village of Kasigluk, intervened.

2010.[4] OCS does not dispute that this notice did not satisfy the requirements of ICWA and CINA rules.[5] The parents did not attend the hearing.

OCS submitted an offer of proof at the hearing that listed the witnesses it intended to call and identified the testimony that supported adjudicating the girls to be children in need of aid and retaining them in OCS custody. Reciting the incorrect assertion by OCS's counsel that the parents had been served with notice, the trial court found the children to be children in need of aid under AS 47.10.011(1), (9), and (10), "based on the offer of proof that conditions leading to removal have definitely not been corrected." Adelaide and Angelica were placed with Xandy, their maternal grandmother, who had a licensed foster home in the village of Eek. A few weeks later Payton and Effie were appointed counsel and, with their counsel, they attended a number of other hearings over the next several years.

In August 2012 OCS petitioned to terminate Payton's and Effie's parental rights to Adelaide and Angelica. In November, the parties stipulated to stay termination

---

[4]    Under CINA Rule 15(a), adjudication "is a trial to the court on the merits of the petition for adjudication." Under CINA Rule 17(a), disposition is the hearing at which the court determines "the appropriate disposition of a child who has been adjudicated a child in need of aid."

[5]    Federal law requires that parents have ten days' notice of "any involuntary proceeding in a State court" by a "party seeking the foster care placement of, or termination of parental rights to, an Indian child," and that they be allowed a 20-day postponement, "upon request," to prepare. 25 U.S.C. § 1912(a). CINA Rule 15(b) requires that parents and other interested parties in an ICWA proceeding receive notice of an adjudication hearing "at least ten days before the hearing" and that the hearing be postponed upon request "to ensure that the Indian child's parents, Indian custodian or tribe have had thirty days from receipt of the notice to prepare for the hearing." CINA Rule 7(f)(2)(G) also requires that parents in ICWA cases be notified of their right to a 30-day postponement "on request . . . to prepare for the adjudication hearing."

proceedings while the Native Village of Eek Tribal Court explored the possibility that Xandy would culturally adopt the girls. Payton and Effie stipulated that the children continued to be children in need of aid and that they had failed to make substantial progress to remedy their conduct and the conditions in their home that placed their daughters at risk of harm.

In the years following adjudication, the parents' problems with substance abuse did not improve; neither parent successfully completed treatment despite OCS's efforts. OCS family services supervisor Katherine Cramer testified at the termination trial about her difficulty locating Payton and Effie to work on their case plan. She "basically begged" them to help her build a positive parenting record by doing sober check-ins twice a week and by not giving up. She arranged and paid for the parents to travel for substance abuse assessments at the Phillips Ayagnirvik Treatment Center (PATC) in Bethel, but Payton went fishing instead and Effie started the program but left without completing it.

An OCS protective services specialist, Patsy Bowen, substantiated reports of Effie's drinking during her pregnancy with Payton Jr. While visiting Effie in the Bethel jail,[6] Bowen helped her fill out an application for treatment at the Women and Children's Center in Fairbanks. Effie eventually was assessed for and diagnosed with alcohol dependency, but again she did not complete the recommended treatment. On a number of occasions Payton and Effie failed to take advantage of travel OCS arranged for them; for example, when Bowen arranged for them to travel to a parenting class, they

---

[6] Bowen could not remember at trial exactly why Effie was in jail but thought it involved a charge of theft, that Effie may have been intoxicated, and that Effie had been assaulted as well.

used their tickets but did not attend the class. On another occasion Payton began treatment at PATC but after three days climbed out a window and never returned.

Both parents admitted to heavy drinking. During an assessment at PATC in June 2011, Payton reported that the longest period of sobriety he had that year was four days. Effie reported during a July 2012 alcohol screening that she was 13 weeks pregnant, drank four or more times a week, and typically had ten or more drinks at a time. In a March 2013 assessment Payton reported that he was unable to regulate his alcohol intake and would go on three-week drinking binges. In April 2013 Effie reported that it was difficult for her to control her drinking when she was in Bethel, and that she blacked out almost every time she drank.

Cramer testified that by the time of trial Payton and Effie had still not addressed their alcohol problems, continued to leave their children without appropriate care, and failed to return to their children when they said they would.

B.    The Children

Adelaide and Angelica lived in Eek with Xandy from August 2010 through October 2013, when OCS removed them because of concerns they were not getting proper supervision. While the girls lived in Eek, Adelaide attended school there. According to the principal, Adelaide had trouble listening to instructions, sitting still, and completing tasks, and she constantly bothered other students. A behavioral health clinician in Bethel testified at the termination trial that Adelaide would benefit from therapy to address her aggressiveness and response to conflict. Wynn testified that Adelaide was very clingy, and Bowen testified that she was hyperactive and sometimes violent.

Adelaide and Angelica were next placed with Betty, a licensed foster parent who lived in Payton's village of Kasigluk. Betty testified at trial that Adelaide was

normal, happy, and doing well in school. She testified she would be "more than happy" to adopt both girls.

When Angelica was four years old, she was hospitalized at the Alaska Native Medical Center for encephalitis. A nurse testified that Angelica was beginning to recover, but she was likely to need extensive physical and neural rehabilitation out of state. She would need speech therapy to learn to talk again and occupational therapy to learn to use her hands. The nurse testified that it was unsafe to leave her alone.

As for Payton Jr., OCS took custody of him very soon after his birth in early 2013. Also dealing with significant health issues, Payton Jr. was placed in foster care with his great-aunt Ida in Kasigluk, who was willing to adopt him.

### C.    The Termination Trial

Effie and Payton eventually withdrew their stipulation that Adelaide and Angelica were children in need of aid, and OCS filed a petition to terminate the parents' rights to the two girls and for a simultaneous adjudication and termination as to Payton Jr. Trial was held in Bethel in December 2013. Payton and Effie were no longer together and lived in different communities. Payton attended the first day and a half of trial telephonically; Effie did not attend at all. The parents did not call any witnesses. OCS presented the testimony summarized above and the testimony of two experts.

Over the parents' objection, the court found Dr. Sarah Angstman, a psychologist, qualified to testify as an expert in clinical psychology. On the basis of her assessment of Adelaide, Dr. Angstman described the child's behavioral problems and medical diagnoses and her continuing need for therapy and individualized education planning.

OCS also called its regional manager, Sharon Fleming, as an expert in child welfare, relying on the second and third categories of the Bureau of Indian Affairs (BIA)

guidelines for the qualification of experts in ICWA cases.[7] Over the parents' objection, the trial court found Fleming qualified. She testified that the children would likely suffer serious physical and emotional damage if returned to their parents' care because of the parents' substance abuse, which had led to abandonment and neglect, and because of the children's special needs and vulnerabilities.

### D.     The Trial Court's Decision

The trial court terminated Payton's and Effie's parental rights in May 2014. The court found that all three children were children in need of aid under

---

[7]      We have looked to the BIA Guidelines for guidance in determining whether a proposed witness meets the heightened ICWA expert requirements. *In re Candace A.*, 332 P.3d 578, 583-84 (Alaska 2014). Under these guidelines the witnesses most likely to meet ICWA's expert requirements are:

> (1) a member of the child's tribe recognized by the tribal community as knowledgeable in tribal customs pertaining to family organization and childrearing practices, (2) a lay expert with substantial experience and knowledge regarding relevant Indian social and cultural standards and childrearing practices and the delivery of child and family services to Indians, or (3) [a] professional person having substantial education in the area of his or her specialty.

*Id.* (quoting *Marcia V. v. State, Office of Children's Servs.*, 201 P.3d 496, 504 (Alaska 2009) (alteration in original) (emphasis omitted) and Guidelines for State Courts; Indian Child Custody Proceedings, 44 Fed. Reg. 67,584, 67,593 (1979)). At the time of these termination proceedings, the 1979 guidelines were in place. They have recently been updated. *See* Guidelines for State Courts and Agencies in Indian Child Custody Proceedings, 80 Fed. Reg. 10,146, 10,157 (Feb. 25, 2015).

AS 47.10.011(1),[8] (6),[9] (8),[10] and (10),[11] and AS 47.10.014.[12] The court found that (1) the

children had been subjected to conduct or conditions described in AS 47.10.011 because

of the parents' abandonment, substance abuse, domestic violence, conduct causing serious

risk of physical harm to the children, and neglect;[13] (2) the parents failed to timely remedy

the conduct or conditions that placed the children at risk;[14] (3) OCS made active but

unsuccessful efforts to provide remedial services and rehabilitative programs designed to

---

[8]     AS 47.10.011(1) allows the trial court to find a child to be in need of aid if the parent has abandoned the child.

[9]     AS 47.10.011(6) allows the trial court to find a child to be in need of aid if it finds that "the child has suffered substantial physical harm, or there is a substantial risk that the child will suffer substantial physical harm, as a result of conduct by or conditions created by the child's parent, guardian, or custodian, or by the failure of the parent, guardian, or custodian to supervise the child adequately."

[10]     The trial court cited "Alaska Stat. Ann. § 47.10.011(B)," plainly intending AS 47.10.011(8)(B)(i) and (ii). Under these provisions the trial court may find a child to be in need of aid if it finds that conduct by or conditions created by the parent placed the child at substantial risk of mental injury as a result of "(i) a pattern of rejecting, terrorizing, ignoring, isolating, or corrupting behavior that would, if continued, result in mental injury; or (ii) exposure to conduct by a household member . . . that is a crime under [certain statutes addressing Offenses Against the Person] . . . ."

[11]     AS 47.10.011(10) allows the trial court to find a child to be in need of aid if the parent's ability to care for the child has been substantially impaired by the addictive or habitual use of intoxicants.

[12]     Under AS 47.10.014 "the court may find neglect of a child if the parent, guardian, or custodian fails to provide the child with adequate food, clothing, shelter, education, medical attention, or other care and control necessary for the child's physical and mental health and development . . . ."

[13]     AS 47.10.088(a)(1); CINA Rule 18(c)(1)(A).

[14]     AS 47.10.088(a)(2); CINA Rule 18(c)(1)(A)(i)-(ii).

prevent the breakup of the Indian family;[15] (4) OCS proved beyond a reasonable doubt, including by the testimony of qualified expert witnesses, that the children would likely suffer serious emotional or physical damage if returned to the parents' custody;[16] and (5) terminating the parents' rights was in the children's best interests.[17] The parents challenge each finding except the finding of active efforts.

## III.   STANDARD OF REVIEW

The trial court's factual findings are reviewed for clear error and are clearly erroneous only if, after a review of the entire record in the light most favorable to the party prevailing below, we are left with a "definite and firm conviction" that a mistake has been made.[18] "Conflicting evidence is generally insufficient to overturn the superior court, and we will not reweigh the evidence when the record provides clear support for the superior court's ruling."[19]

The trial court's determination that a witness may testify as an expert is reviewed for an abuse of discretion, which occurs when "the reasons for the exercise of

---

[15]   25 U.S.C. § 1912(d) (2012).

[16]   25 U.S.C. § 1912(f).

[17]   CINA Rule 18(c)(3); *see also* AS 47.10.088(c).

[18]   *Emma D. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 322 P.3d 842, 849 (Alaska 2014) (quoting *Chloe O. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 309 P.3d 850, 855 (Alaska 2013)).

[19]   *Maisy W. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 175 P.3d 1263, 1268 (Alaska 2008).

discretion are clearly untenable and unreasonable."[20]  Whether the expert testimony satisfies ICWA's requirements is a legal question reviewed de novo.[21]

## IV.   DISCUSSION

### A.   It Was Error To Enter An Adjudication And Disposition Order When The Parents Lacked Proper Notice Of The Hearing, But The Error Did Not Affect The Outcome Of The Case.

The parents contend that their due process rights were violated because they did not receive proper notice of the November 2010 adjudication and disposition hearing; they were not appointed counsel to represent them at that time; and the court entered findings in their absence based on OCS's offer of proof.  OCS concedes that notice was inadequate.  Alaska's CINA rules require that an Indian child's parents, Indian custodian, or tribe receive notice "at least ten days before the [adjudication] hearing," and that the notice inform them of, among other things, their right to a postponement of up to 30 days to prepare.[22]  The notice must also inform the parents of their right to appointed counsel if they are indigent.[23]  Federal law similarly requires at least ten days' notice and extra time to prepare if requested.[24]  Effie and Payton did not receive the benefit of these provisions; certified mail receipts show that they did not receive their notices until

---

[20]     *L.G. v. State, Dep't of Health & Soc. Servs.*, 14 P.3d 946, 950 (Alaska 2000).

[21]     *See id.*

[22]     *See* CINA Rule 7(f)(2)(G); CINA Rule 15(b).

[23]     *See* CINA Rule 7(f)(2)(F).  The rules further require the court to "inform the parties at the first hearing at which they are present of their respective rights to be represented by counsel at all stages of the proceedings."  CINA Rule 12(a).

[24]     *See* 25 U.S.C. § 1912(2) (2012).

November 4, 2010, the day of the adjudication hearing. We also note with concern that the findings and order of adjudication and disposition, drafted by counsel for OCS and adopted by the trial court, contained the misleading assertion that "[t]he parents . . . were not present although both were served with notice of this hearing."

The failure of notice in CINA proceedings may violate due process.[25] But parties claiming a due process violation must establish that they likely would have achieved a more favorable outcome with proper notice.[26] "Although the due process analysis is a flexible and contextual one focusing on the interest and not the outcome, there must be some actual prejudice . . . and not merely the 'theoretical possibility of prejudice.' "[27]

Effie and Payton identify three ways in which they claim they were prejudiced by the lack of early notice.[28] They argue that "[t]he most basic effect of proper notice . . . would have been to fully alert [them] to the importance of the legal proceeding and its effect on their family"; as it was, they may not have appreciated that OCS's involvement was likely to be long-term and could result in termination of their parental rights. Second, they argue that lack of notice prejudiced their ability to obtain counsel who could have explained the potential impact of their non-appearance, "preserved

---

[25]    *See D.M. v. State, Div. of Family & Youth Servs.*, 995 P.2d 205, 212-14 (Alaska 2000) (noting that in many cases, late or inadequate notice may deny the parent due process, but concluding that there had been no showing that lack of proper notice risked erroneous termination of parental rights).

[26]    *Paula E. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 276 P.3d 422, 433 (Alaska 2012).

[27]    *Id.* (quoting *D.M.*, 995 P.2d at 212) (citations omitted).

[28]    Payton briefs this issue on appeal; Effie adopts Payton's argument by reference.

objections[,] and protected their rights." Finally, they contend that parents who come late to CINA proceedings may view OCS custody of their children as a fait accompli and be discouraged from engaging in reunification services.

But both Effie and Payton were appointed counsel shortly after the adjudication and disposition hearing; their lawyers had appeared for them by early December 2010. The parents had the benefit of counsel at every subsequent step of the proceedings, of which there were many — including, at one point, the parents' stipulation that the two girls continued to be children in need of aid and the parents' consent to a cultural adoption (later withdrawn). The record shows that the parents were repeatedly reminded of the enormity of the proceedings in which they were involved and their need to work hard to recover custody of their children. And in the three years between the adjudication order and the termination trial, they had ample opportunity to identify and correct any claimed prejudice due to OCS's failure to provide proper notice at the adjudication stage. Indeed, the judge invited briefing on the issue when Payton's counsel raised it at a status hearing in 2011, but the parties did not follow up and apparently did not mention the issue again until their post-trial briefing at the termination stage. On appeal they identify no issues that were not fully aired and no chances of reunification that were forgone because of the procedural errors at the case's initial stage.

Finally, there is no dispute that Effie and Payton had proper notice of the termination trial (Payton attended part of it) and were represented at trial by counsel. The trial court's CINA findings at termination were made under the "clear and convincing evidence" standard, higher than the "preponderance of the evidence" standard employed at adjudication,[29] and were based on the testimony and exhibits presented at trial rather

---

[29] *See Alyssa B. v. State, Dep't of Health & Soc. Servs., Div. of Family &*
(continued...)

than an offer of proof. Under the circumstances we can only conclude that any actual prejudice caused by procedural deficiencies early in the case was eliminated during the course of subsequent proceedings and had no likely effect on the outcome of this case; this leaves "merely the 'theoretical possibility of prejudice' "[30] — not enough to require that we find a violation of due process or reverse the judgment.

**B.    The Trial Court Did Not Clearly Err In Finding That The Children Were Children In Need Of Aid.**

The trial court may find a child to be a child in need of aid if it finds that the child has been subjected to any of the conduct or conditions listed in AS 47.10.011(1) through (12). Where the record supports one ground for a CINA finding, we do not need to consider the trial court's other findings.[31]

A child is a child in need of aid if the "parent['s] . . . ability to parent has been substantially impaired by the addictive or habitual use of an intoxicant, and the addictive or habitual use of the intoxicant has resulted in a substantial risk of harm to the child."[32] The statute does not require that a child be present when the substance abuse

---

[29](...continued)
*Youth Servs.*, 165 P.3d 605, 610 (Alaska 2007) (holding that challenges to a trial court's finding of probable cause — including an allegation that the father did not receive notice of the hearing — were mooted when the trial court later decided CINA status at the adjudication stage by a preponderance of the evidence, a higher standard).

[30]    *Paula E.*, 276 P.3d at 432-33 (quoting *D.M.*, 995 P.2d at 212).

[31]    *See Sherman B. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 290 P.3d 421, 431 (Alaska 2012) ("Because we affirm the superior court's finding of abandonment, we do not reach the State's alternative argument for termination based on neglect.").

[32]    AS 47.10.011(10).

occurred.[33]  Here, the trial court found by clear and convincing evidence that the parents' habitual use of alcohol substantially impaired their ability to parent, causing a substantial risk of harm to the children.

Effie argues that there was insufficient evidence to support this finding because the trial court cited only one specific episode — when OCS found Payton intoxicated with Adelaide and Angelica in the house and Effie absent.  The trial court addressed this argument, finding that "the evidence confirms the substance abuse has been, and continues to be, a serious problem for both parents.  Furthermore, it is a problem that neither parent seems willing to meaningfully address."  The court noted that Effie had been diagnosed with alcohol dependence on at least eight different occasions, beginning in 2005, and had been in and out of treatment numerous times.  The court also addressed Payton's substance abuse diagnoses and offered examples of his behavior while intoxicated, beginning in 2006.  The court pointed out that even if the "OCS workers never witnessed the parents' intoxicated behavior, it is also true the parents have continually admitted to binge-drinking"; that Xandy "has told OCS workers about the parents' monthly trips to Bethel wherein the parents binge-drink"; and that "in the past three years, neither parent has completed a single alcohol treatment program."

Because the record supports the trial court's findings about substance abuse, we affirm its finding that Adelaide, Angelica, and Payton Jr. were children in need of aid on this ground and do not reach the others.

---

[33]     *Lucy J. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 244 P.3d 1099, 1113 (Alaska 2010); s*ee also Christina J. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 254 P.3d 1095, 1106 (Alaska 2011) ("[A] child need not be present when substance abuse is occurring in order to suffer its negative impacts.").

**C.** **The Trial Court Did Not Clearly Err In Finding That Both Parents Failed To Remedy The Conduct That Placed The Children At Substantial Risk Of Harm.**

Before terminating parental rights the trial court must find by clear and convincing evidence that the parent "has failed, within a reasonable time, to remedy the conduct or conditions in the home that place the child in substantial risk so that returning the child to the parent would place the child at substantial risk of physical or mental injury."[34] "[W]hether the parent has remedied the conduct or conditions . . . that place the child at substantial risk . . . [is a] factual determination best made by a trial court after hearing witnesses and reviewing evidence . . . ."[35]

The trial court found that because the parents "did not complete a single substance abuse program in three years" and "have not evinced any desire to rectify their alcohol problems," there was clear and convincing evidence that they had not remedied their substance abuse. The trial court's findings highlighted the extent to which it believed the parents' drinking took priority over their children: they "only parented when it was convenient for them," often leaving town for indefinite periods without explanation. The court expressed concern that Payton and Effie continued to binge drink and did not show that parenting was a priority for them by attending the termination trial. (Payton called in the first day and a half of the five-day trial; Effie did not appear at all.)

---

[34]     AS 47.10.088(a)(2)(B).

[35]     *Ralph H. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 255 P.3d 1003, 1008 (Alaska 2011) (alterations in original) (quoting *Barbara P. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 234 P.3d 1245, 1253 (Alaska 2010)).

Findings of continued substance abuse and refusal to undergo treatment are sufficient to satisfy "failure to remedy."[36] The parents' lengthy histories of alcohol abuse, their failure to complete treatment, and the years they had to demonstrate sobriety between OCS's first involvement with their children and the eventual trial on termination of their parental rights all support the trial court's finding that they failed to remedy their conduct within a reasonable time, and we therefore affirm it.

**D.      The Trial Court Did Not Err In Concluding That The Children Would Likely Suffer Serious Emotional Or Physical Harm If Returned To Their Parents' Custody.**

A court may not terminate parental rights to an Indian child unless it finds "by evidence beyond a reasonable doubt, including testimony of qualified expert witnesses, that the continued custody of the child by the parent . . . is likely to result in serious emotional or physical damage to the child."[37] This finding may be proved through the testimony of one or more expert witnesses or by aggregating the testimony of lay and expert witnesses.[38] "[T]he [S]tate's expert testimony need not meet the burden of proof standing alone so long as it supports the court's conclusion."[39]

**1.      The trial court did not abuse its discretion when it found that the State's experts were qualified under ICWA.**

---

[36]      *See, e.g.*, *Stanley B. v. State, DFYS*, 93 P.3d 403, 407 (Alaska 2004).

[37]      25 U.S.C. § 1912(f) (2012); CINA Rule 18(c)(4).

[38]      *L.G. v. State, Dep't of Health & Soc. Servs.*, 14 P.3d 946, 950-51 (Alaska 2000).

[39]      *Ben M. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 204 P.3d 1013, 1020 (Alaska 2009) (citing *E.A. v. State, Div. of Family & Youth Servs.*, 46 P.3d 986, 992 (Alaska 2002)).

Effie argues that the trial court erred when it qualified Dr. Angstman and OCS protective services manager Sharon Fleming as ICWA experts.[40] We note first that the trial court did not rely on Dr. Angstman's testimony for its ICWA-required findings; the court noted that she had "expressed no opinion concerning whether the parents' conduct will cause serious[] physical or emotional harm to [Adelaide]." Instead the trial court relied primarily on the testimony of Fleming.

The trial court observed that Fleming has a master's degree in social work, is a licensed master's-level social worker, and takes 45 hours of continuing education every two years, including substantial class work related specifically to Alaska Natives and substance abuse. The trial court described her work history with OCS as including supervisory and management positions in Juneau, St. Mary's, and Bethel, beginning in "the early 2000s." The trial court noted that Fleming "was first qualified as an ICWA expert in 2004" and has been qualified as an ICWA expert "an estimated 10-15 times" since. The trial court quoted from our opinion in *Lucy J. v. State, Department of Health & Social Services, Office of Children's Services*, in which Fleming's qualifications as an ICWA expert were also at issue; we noted in that 2010 case that Fleming had "worked at

---

[40] Payton argues that Fleming's testimony was insufficient to support the trial court's findings, in part because her opinions were based on a review of the relevant files rather than direct contact with the family. "[W]e have . . . acknowledged that an expert's exclusive reliance on the case file without speaking to the parent or child may weaken the testimony." *Marcia V. v. State, Office of Children's Servs.*, 201 P.3d 496, 507 (Alaska 2009) (citing *J.J. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 38 P.3d 7, 10 (Alaska 2001)). But "[a] review of state records and summaries of relevant facts can be enough if they 'keep the expert's testimony sufficiently grounded in the facts and issues of the case.' " *Id.* (quoting *J.A. v. State, DFYS*, 50 P.3d 395, 400 (Alaska 2002)).

OCS for six years" and had "served as a supervisor for four years."[41] In *Lucy J.*, reviewing the court's acceptance of Fleming as an ICWA expert for plain error since the parent had not objected at trial, we affirmed "because it was possible to infer from Fleming's known qualifications that she possessed the qualifications necessary under ICWA."[42] The trial court in this case observed that Fleming had continued working for OCS since the *Lucy J.* case, continuing to acquire credit hours in Alaska Native education and "a substantial amount of experience and knowledge in Alaska Native culture" over the intervening years. The trial court concluded that Fleming had "expertise beyond the normal social worker qualifications" and therefore satisfied the third subpart of the BIA guidelines for qualifying ICWA experts. These findings are well supported by the testimony at trial, in which Fleming also described her practicums at Alaska Psychiatric Institute (where she performed psychological assessments) and the Salvation Army's Clitheroe Center for treating substance abuse; her continuing training in fetal alcohol spectrum disorder, domestic violence, family services assessments, case planning, brain development, and trauma; and her participation in a tribal-state collaboration that meets regularly to discuss brain development and the impact of trauma.

Effie challenges the court's conclusion that Fleming was qualified "under the second category of ICWA experts that are qualified to distinguish between the cultural and social standards prevailing in Indian communities and families and actual abuse or neglect." This second category recognizes as potential ICWA experts lay persons who have "substantial experience in the delivery of child and family services to Indians, and extensive knowledge of prevailing social and cultural standards and childrearing practices

---

[41]     244 P.3d 1099, 1118-19 (Alaska 2010).

[42]     *Id.* at 1119.

within the Indian child's tribe."[43]  Effie contends that Fleming lacks the requisite experience and knowledge specific to the "prevailing social and cultural standards and childrearing practices [of] Yup'ik Eskimos."

We reject this challenge for several reasons.  First, termination proceedings under ICWA do not require testimony by an expert in Native culture if the grounds for termination do not implicate cultural biases — such as in a case like this one involving parental substance abuse.[44]  Effie argues that cultural mores were clearly implicated by the substance abuse at issue in this case:  specifically, "[w]hether the parents were practicing the typical Yup'ik 'it takes a village' style of parenting."  She maintains that under "village custom, . . . it was acceptable for [the parents] to drink provided that their children were not present," and that OCS's case necessarily failed because it lacked an expert qualified to address this cultural practice.  But Effie's assertion that "[c]ultural mores and society were implicated in this termination trial" does not appear to have been raised in the trial court, and she presented no evidence to support it.[45]

---

[43]     Guidelines for State Courts; Indian Child Custody Proceedings, 44 Fed. Reg. 67,584, 67,593 (1979).

[44]     *See, e.g.*, *Thea G. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 291 P.3d 957, 964 (Alaska 2013) (upholding qualification of expert to testify about effects of substance abuse on families and effects of delayed permanency on children despite her lack of expertise in Alaska Native culture); *L.G. v. State, Dep't of Health & Soc. Servs.*, 14 P.3d 946, 952, 954 (Alaska 2000) (noting that "[w]hen there is clear evidence of physical neglect, a trial judge may terminate parental rights without hearing testimony from an expert in Native culture[;]" and "[f]ar from reflecting mere cultural differences in the care of Native children, [the mother's] history of serious substance abuse places [her  children] at a clear risk of future harm if returned to her custody").

[45]     Effie's citations to the transcript show only that *Effie* believed substance
(continued...)

Finally, the trial court found Fleming qualified to be an ICWA expert not only under subpart (2) of the ICWA guidelines, but also under subpart (3), as a "professional person" who has "expertise beyond the normal social worker qualifications."[46] As Effie only challenges Fleming's qualification under subpart (2), Fleming's qualification under subpart (3) provides an independent basis on which to uphold the trial court's reliance on her expert testimony.[47]

**2.      The trial court did not clearly err when it found that returning the children to their parents' custody would likely result in serious harm to the children.**

The parents dispute the trial court's factual finding that their continued custody of Adelaide, Angelica, and Payton Jr. would likely result in serious emotional or physical damage to the children, contending that they never put their children in harm's way or failed to meet the children's emotional needs.

---

[45](...continued)
abuse was not a problem if she drank outside the presence of the children, not that this was consistent with her Native cultural traditions. There was also testimony that having the grandmother raise the oldest daughter was consistent with Native tradition, but the parents' problems with substance abuse were not mentioned in this context.

[46]      *See Marcia V. v. State, Office of Children's Servs.*, 201 P.3d 496, 504 (Alaska 2009) (quoting H.R. Rep. No. 95-1386, at 22 (1978), *as reprinted in* 1978 U.S.C.C.A.N. 7530, 7545). Although the trial court found Fleming qualified under both subparts (2) and (3) at trial, its termination order relied solely on subpart (3).

[47]      Effie also suggests that Fleming's testimony was unpersuasive because, as an OCS employee, she was biased toward OCS. We addressed this issue recently in *Sylvia L. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 343 P.3d 425, 434 (Alaska 2015) (upholding trial court's qualification of OCS social worker as ICWA expert witness because "it is well settled that an allegation of bias goes to testimony's weight, not its admissibility").

The trial court heard testimony from lay witnesses who described the parents' substance abuse and the children's behavior and risk of harm. The trial court also relied heavily on Fleming's expert testimony that the parents' substance abuse caused them to neglect and abandon their children, that they had not remedied this behavior, and that they appeared unwilling to do so. The court addressed each child's situation in turn: "[Adelaide] has special needs and [Angelica] is going to need consistent intensive care when she returns home from therapy. . . . [D]ue to his age, [Payton Jr.] is at risk because he cannot remove himself from any danger that could emerge." These findings are well supported by the evidence. We cannot conclude that the trial court clearly erred when it found, beyond a reasonable doubt, that the parents' continued custody of Adelaide, Angelica, and Payton Jr. would likely result in serious emotional or physical damage to the children.

### E. The Trial Court Did Not Clearly Err In Finding That Termination Of The Parents' Rights Was In The Children's Best Interests.

Alaska Statute 47.10.088(c) requires a court to consider the best interests of the child before terminating parental rights. Best interests determinations are factual findings reviewed for clear error.[48]

The trial court found by a preponderance of the evidence that termination of parental rights was in the best interests of all three children. The court cited Adelaide's severe emotional problems at school, Dr. Angstman's diagnosis of her behavioral disorder, and Angelica's need for constant, stable care and access to medical treatment if she is to recover from her serious illness. The trial court noted that the girls' foster mother is willing to adopt them both and has demonstrated her commitment by helping

---

[48] *Christina J. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 254 P.3d 1095, 1104 (Alaska 2011).

Adelaide improve her grades and by staying with Angelica throughout her medical trauma. As for Payton Jr., the trial court contrasted his parents' "distinct lack of stability" with his "current stable home environment." And as OCS points out, the foster parents of all three children are members of the Kasigluk tribe, and if parental rights are terminated the children will still be connected with their Native culture. The parents point to nothing in the record from which we could conclude with a "definite and firm conviction" that the trial court was mistaken in finding that the children's best interests required the termination of Payton's and Effie's parental rights.[49]

## V. CONCLUSION

The order terminating Payton's and Effie's parental rights to their three children, Adelaide, Angelica, and Payton Jr., is AFFIRMED.

---

[49] *Emma D. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 322 P.3d 842, 849 (Alaska 2014).