NOTICE

*Memorandum decisions of this court do not create legal precedent. A party wishing to cite such a decision in a brief or at oral argument should review Alaska Appellate Rule 214(d).*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| TARYN M., | ) | |
| | ) | Supreme Court No. S-16326 |
| Appellant, | ) | |
| | ) | Superior Court No. 4AK-15-00008 CN |
| v. | ) | |
| | ) | MEMORANDUM OPINION |
| STATE OF ALASKA, DEPARTMENT | ) | AND JUDGMENT* |
| OF HEALTH & SOCIAL SERVICES, | ) | |
| OFFICE OF CHILDREN'S SERVICES, | ) | No. 1641 – July 19, 2017 |
| | ) | |
| Appellee. | ) | |
| | ) | |

Appeal from the Superior Court of the State of Alaska, Fourth Judicial District, Bethel, Nathaniel Peters, Judge pro tem.

Appearances: Rachel Cella, Assistant Public Defender, and Quinlan Steiner, Public Defender, Anchorage, for Appellant. Dario Borghesan, Assistant Attorney General, Anchorage, and Jahna Lindemuth, Attorney General, Juneau, for Appellee.

Before: Stowers, Chief Justice, Winfree, Maassen, Bolger, and Carney, Justices.

## I. INTRODUCTION

The superior court found a child to be in need of aid pursuant to AS 47.10.011(1) (abandonment), (6) (substantial physical harm or substantial risk

---

\*      Entered under Alaska Appellate Rule 214.

thereof), (8) (domestic violence), and (10) (substance abuse). The child's mother appeals, arguing that the court violated her right to due process when it precluded the child from testifying at the adjudication hearing. Because the mother did not suffer actual prejudice from the superior court's decision, we affirm.[1]

## II.    FACTS AND PROCEEDINGS

### A.    The Probable Cause Hearing

Taryn M.[2] is the mother of nine-year-old Trudy, an "Indian child" as defined by the Indian Child Welfare Act of 1978.[3] Trudy is affiliated with the Organized Village of Grayling. The Office of Children's Services (OCS) took emergency custody of Trudy after it received a report that Taryn's boyfriend, Lowell, had been stabbed in their home during a night of drinking on June 5, 2015, and had been medevaced to Anchorage. OCS worker Christine Kuehn testified that when she arrived in Grayling to investigate the incident on June 8, Taryn informed her that she planned to join Lowell in Anchorage and that Trudy would be left in the care of her grandmother and grandmother's boyfriend. Kuehn was concerned because of previous allegations that the grandmother's boyfriend had sexually abused Trudy.

Kuehn therefore took emergency custody of Trudy, and the next day OCS filed a petition for temporary custody and emergency adjudication of Trudy's status as

---

[1]    The trial court dismissed this matter in April 2017 after custody had lapsed. Taryn M. filed a motion to vacate the trial court's adjudication order, noting that the dismissal "potentially render[ed her] appeal moot." In the alternative, she asked this court to review her case on the merits under the collateral consequences exception to the mootness doctrine. We find her argument regarding collateral consequences well taken, and address the merits of her appeal.

[2]    Pseudonyms have been used to protect the family's privacy.

[3]    *See* 25 U.S.C. § 1903(4) (2012).

a child in need of aid. The petition recounted concerns about parental alcohol abuse and domestic violence, and it alleged that Trudy was a child in need of aid based on "imminent risk of continued neglect, exposure [to] domestic violence, and possibly physical harm."

At a probable cause hearing in August Kuehn testified that she "had heard that there had been continual drinking in the home and [Taryn's] sister normally took care of Trudy when they would drink; she would go over there and get Trudy." She stated that "[o]ftentimes people would go over there and get the child or the child would wander looking for a place to stay or something to eat while people were drinking in the home." Kuehn stated that Trudy sometimes slept over at her grandmother's home when Taryn was drinking. Kuehn also recounted Trudy's statement to her that Taryn and Lowell fought verbally and physically.

Taryn provided evasive answers and contradictory statements during the probable cause hearing. For example, when questioned about a 2012 sexual assault allegation involving the grandmother's boyfriend, she stated that she did not know why law enforcement took her daughter to Bethel, but in her closing argument she indicated that she had in fact initiated the investigation after she suspected sexual abuse. Taryn did not testify about the night of the stabbing other than to say she did not remember the events; she asserted her Fifth Amendment privilege. She did, however, state that when she drank, Trudy always spent the night with friends.

The Tribal Family Youth Specialist for Grayling, Johanna Hamilton, testified that she had personally seen Taryn and her boyfriend drunk on one occasion when she visited their house but that Trudy was not in the house at that time. Hamilton testified that to her knowledge Trudy had never been injured by anyone while in Taryn's care.

Although Taryn had testified that Trudy never stayed in the house when Taryn was drinking, Hamilton responded affirmatively when asked by Taryn's attorney on cross-examination, "[W]hen [Trudy] found herself in the company of intoxicated people, she'd go to one of her friends' houses, correct?" Taryn's attorney then clarified, "And so that's how she would be safe, correct?" to which Hamilton again responded affirmatively.

The court found probable cause that Trudy was a child in need of aid under AS 47.10.011(1) (abandonment), (6) (substantial physical harm or substantial risk thereof), (7) (sexual abuse), (8) (domestic violence), and (10) (substance abuse) and placed her in the temporary custody of the State.

## B. The Adjudication Hearing

After the probable cause hearing, Taryn subpoenaed Trudy to testify at the adjudication hearing. Trudy's guardian ad litem (GAL) moved to quash the subpoena, noting that Alaska Child in Need of Aid (CINA) Rule 3(b) and *A.H. v. State* grant the court the authority to excuse Trudy from participating in the proceedings.[4] The GAL asserted that compelling then-eight-year-old Trudy to testify about traumatic events and subjecting her to adversarial proceedings would likely cause her harm. The GAL's counsel acknowledged that "there's not a lot of evidence other than kind of common sense reasons whether the child would be traumatized or not." She noted that she did not know the parties' intended questions, but she stated, "I do think that there is an inherent stress associated with court proceedings and being cross-examined. And to the extent

---

[4] CINA Rule 3(b) ("A child who is not of suitable age to understand or participate in the proceedings need not be present at hearings unless the court so orders. The court may excuse the presence of a child who is of suitable age if attendance would be detrimental to the child."); 779 P.2d 1229, 1234-35 (Alaska 1989) (noting that court has discretion to determine whether to allow children to testify in CINA proceedings).

that it's possible to shield the child from that, I think that that's in her best interest." The GAL also argued that Trudy was too young to understand or meaningfully participate in the proceedings and that the evidence sought from her testimony could be obtained through other witnesses.

Taryn opposed the GAL's motion, arguing that due process required that she be allowed to call witnesses in her defense. Taryn argued that Trudy's testimony would establish that she was not placed at risk of harm by Taryn's behavior and that Trudy was able to protect herself. Taryn argued that other witnesses' testimony about Trudy's statements would not suffice because "[f]irst of all, hearsay is not admissible in a CINA adjudication hearing, and secondly, many of those witnesses may be mistaken."

Taryn also noted that the GAL had identified no specific harm to Trudy from testifying and had presented no expert evidence to support her opinion that an eight-year-old child should not participate in adversarial proceedings. Taryn argued that "just general stress" was not a sufficient reason to prevent a child from testifying, and that the GAL should show "real trauma that's going to mess people up for a long time." She asserted that there was nothing in the record to show that Trudy "is going to be messed up for the rest of her life or even a month or so" if she testified.

The GAL proposed that if no other witnesses could provide the information sought from Trudy, the court could conduct an in camera interview with questions submitted in advance by the parties. Taryn opposed an in camera interview because "in camera interviews by a judge are not testimony. They're certainly not subject to cross[-examination]. . . . And it turns the judicial officer into . . . an advocate . . . ." Taryn instead requested that she be allowed to depose Trudy if she could not question her during the adjudication hearing.

The court granted the GAL's motion to quash the subpoena. It relied upon the "common sense" notion that testifying at trial would not be in an eight-year-old

child's best interests and determined that Trudy's proposed testimony would not be exclusive or particularly probative. It stated, "[T]he court believes most if not all of the proffered testimony should be available via other witnesses with the possible exception of whether [Trudy] thought she was at risk of harm, but most 8[-year-]olds would not fully appreciate the risks associated with intoxicated caregivers."

At the adjudication hearing Taryn's boyfriend, Lowell, testified that he did not drink very often. He testified that when he and Taryn did drink, Trudy would go to her grandmother's or aunt's home, and that Trudy had never witnessed him and Taryn drinking. He stated that he, Taryn, and a friend had been drinking when the June 2015 stabbing incident occurred, and that he did not remember anything about the events surrounding the stabbing. But he stated that Trudy had been at her grandmother's when the people in Taryn's home started drinking that night.

Kuehn's testimony at the adjudication hearing about Trudy's whereabouts on the night of the stabbing was somewhat ambiguous:

> Q: The night before [Trudy] was removed, did [Taryn] state where [Trudy] was the night she was drinking?
>
> A: No, she did not. The night that she was drinking — are you referring of the incident or —
>
> Q: The incident.
>
> A: Okay. [Taryn] had shared with me that she was in the home, sleeping.

The court understood this testimony to mean that Taryn told Kuehn that Trudy was sleeping at home when the stabbing incident occurred. Taryn did not clarify the statement on recross-examination of Kuehn, nor does she challenge the court's interpretation on appeal.

OCS's expert in the delivery of child protective services, Deborah Reichard, testified that she believed it was not safe for Trudy to return to Taryn's care.

Reichard based her opinion in part on a report prepared by Hamilton, in which the latter had expressed concern about substance abuse in the home. Reichard also relayed an incident in which Taryn visited Trudy's foster parents' village while intoxicated, but the source of this information is unclear.

Taryn did not testify at the adjudication hearing. In her written closing arguments, Taryn addressed the concern about Trudy's presence in the home during the stabbing incident only by stating, without further explanation, "OCS's concerns are probably based on a misunderstanding of the assault upon [Lowell]." She asserted that there was "no evidence that [Trudy] was ever even nearby when the stabbing occurred."

The court found Trudy to be a child in need of aid under AS 47.10.011(1), (6), (8), and (10).[5] The court based its findings under subsection (6) (substantial physical harm or substantial risk of substantial physical harm), on the June 2015 stabbing incident. The court acknowledged testimony that Trudy was not inside the home when the drinking started that evening but noted that "the uncontradicted testimony from OCS at the adjudication trial was that [Taryn] told OCS that [Trudy] was at the home sleeping during the actual stabbing incident." The court found that while Trudy may not have witnessed the stabbing incident, it still placed her at risk of harm: The stabbing occurred while Trudy was in the home; it may have been perpetrated by Taryn; and either Taryn's claim that she did not remember anything was untrue, or she was "too intoxicated to know what [was] happening."

In finding Trudy to be in need of aid under subsection (8) (domestic

---

[5]     Trudy was found to be in need of aid under subsection (1) (abandonment), only with regard to her father. The findings with regard to the father are not at issue in this appeal. OCS initially pursued a finding under subsection (7) (sexual abuse), as well, but ultimately withdrew that argument. The court found that OCS had not shown Trudy to be a child in need of aid under AS 47.10.011(9) (neglect).

violence), the court noted the uncontradicted testimony that Trudy had never been physically abused or subjected to domestic violence by Taryn or Lowell. But the court again expressed concern about the stabbing incident. It found that, given the lack of clarity about what happened that night, Taryn was just as likely to have committed the stabbing as the friend who had been drinking with her and Lowell. If Taryn had committed the stabbing, it would constitute an act of domestic violence. The court also referred to hearsay testimony from the probable cause hearing that Trudy had told Kuehn, in effect, that Taryn and Lowell "fight with both words and fists." In adjudicating Trudy a child in need of aid, the court relied on this statement to find that Trudy had witnessed domestic violence between Taryn and Lowell, or at least was aware of its occurrence. The court found that she was at risk of mental injury under subsection (8).

The court also found Trudy to be in need of aid under subsection (10) (substance abuse). It noted Taryn's argument that she never drank in front of Trudy but turned again to the uncontradicted testimony that Trudy was home during the stabbing incident when both Taryn and Lowell were intoxicated. The court also referred to testimony from other witnesses that Trudy's aunt had to pick her up on multiple occasions after Taryn started drinking and that Trudy would sometimes look for her own food and a place to stay while her mother was drinking.[6] It noted that Trudy had previously been in tribal custody because of Taryn's drinking. The court concluded that Taryn's willingness to engage in treatment indicated that she was aware of "a problem with substances in her life and in her ability to care for [Trudy]."

Taryn appeals the court's determination that Trudy is a child in need of aid,

_____

[6] The court appears to be referring to hearsay testimony from Kuehn. The court also expressed concern about unspecified "reports . . . that [Taryn] [was] still drinking in the home as [of] the adjudication trial."

arguing that the superior court violated her right to due process when it refused to allow Trudy to testify.

## III. STANDARD OF REVIEW

"Whether due process rights are violated in a CINA case is a question of law that this court reviews de novo, adopting 'the rule of law that is most persuasive in light of precedent, reason and policy.' "[7]

## IV. DISCUSSION

Alaska's CINA Rules provide certain protections for children involved in such proceedings. CINA Rule 3(b) permits the court to excuse a child from the proceedings if the child is "not of suitable age to understand or participate in the proceedings" or "if attendance would be detrimental to the child."[8] We have held that the decision whether to allow a child to testify regarding his or her desired placement is "clearly" committed to the discretion of the trial court pursuant to Rule 3(b).[9] Rule 3(d) allows the court to exclude a child during testimony in order to avoid psychological harm to the child, or to exclude a parent, guardian, or custodian during the child's testimony in order to avoid material psychological harm to the child.[10] And Rule 8(g) prohibits the deposition of children younger than 16 except pursuant to court order.[11]

---

[7] *Philip J. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 264 P.3d 842, 846 (Alaska 2011) (quoting *Jeff A.C., Jr. v. State*, 117 P.3d 697, 702 (Alaska 2005)).

[8] CINA Rule 3(b).

[9] *A.H.*, 779 P.2d at 1234-35.

[10] CINA Rule 3(d).

[11] CINA Rule 8(g).

Parents are entitled to due process throughout CINA proceedings.[12]  To establish a due process violation in a CINA proceeding, a parent must show that the contested court action resulted in "actual prejudice . . . and not merely the 'theoretical possibility of prejudice.' "[13]  In other words, the parent must show that he or she "likely would have achieved a more favorable outcome" with additional procedural safeguards.[14]

Taryn argues that she was prejudiced by the court's refusal to allow Trudy to testify.  Taryn asserts that Trudy's testimony regarding the night of the stabbing was essential to her case, as Trudy would have been the most credible source of information regarding her own whereabouts that night.  She notes Lowell's testimony that only he, Taryn, and their friend were in the house at the time of the stabbing and Hamilton's testimony at the probable cause hearing that she saw Trudy playing outside earlier that evening.  Taryn argues that this testimony "cast[s] doubt on the reliability of the purportedly 'uncontradicted' evidence of Trudy's whereabouts," and she concludes that eliciting Trudy's testimony was her only means of definitively rebutting OCS's allegations.

As OCS points out, Lowell in fact testified that he was so intoxicated that he could not remember anything from the time of the stabbing, and Hamilton testified that she did not know whether Trudy was in the home when the stabbing took place.  In its findings under AS 47.10.011(6) the court noted Lowell's and Hamilton's conflicting testimony regarding where Trudy was *before* the stabbing occurred but relied on Taryn's

---

[12]    *See Payton S. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 349 P.3d 162, 168 (Alaska 2015).

[13]    *Paula E. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 276 P.3d 422, 433 (Alaska 2012) (quoting *D.M. v. State, Div. of Family & Youth Servs.*, 995 P.2d 205, 212 (Alaska 2000)).

[14]    *Payton S.*, 349 P.3d at 168 (citing *Paula E.*, 276 P.3d at 433).

own statement to Kuehn regarding Trudy's presence in the home *during* the stabbing. Contrary to Taryn's assertion, Lowell's and Hamilton's testimony did not create a factual dispute about Trudy's whereabouts during the stabbing. Taryn's insistence that the preclusion of Trudy's testimony allowed the court "to resolve important factual uncertainties in the [S]tate's favor" is therefore without merit.

Furthermore, Trudy was not the only potential source of testimony to contradict OCS's assertions. Taryn herself could have taken the stand to rebut Kuehn's statement that Taryn told her Trudy was home when the stabbing occurred, but she declined to do so. She has not offered any argument why she could not have called another witness to testify about Trudy's whereabouts that night. If Trudy was with her grandmother, a babysitter, or another adult, that person could have testified that Trudy was in his or her care when the stabbing occurred. But Taryn presented no evidence to contradict her statement that Trudy was at home that night, and she failed to seek testimony from any other witnesses. And even if Trudy had testified, the court likely would not have found her testimony probative because most children her age would not appreciate whether they were placed at risk by intoxicated caregivers or accurately and reliably recall their whereabouts on a night more than six months removed from their testimony. We conclude that Taryn has offered only a "theoretical possibility" that Trudy's testimony would have changed the outcome of the adjudication hearing. This merely theoretical possibility of prejudice is insufficient to establish a violation of Taryn's right to due process.[15]

---

[15] *See In re Jacob S.*, 384 P.3d 758, 764-65 (Alaska 2016) (quoting *Paula E.*, 276 P.3d at 433) (allowing testimony by phone did not create more than "theoretical possibility of prejudice" where appellant made no attempt to question witnesses' credibility).

Taryn argues that the absence of testimony from Trudy also led the court to rely inappropriately on hearsay evidence from the probable cause hearing. In making its findings under AS 47.10.011(8), the court referred to Kuehn's hearsay testimony that Trudy had stated Taryn and Lowell "fight not only with words, but with their hands." In its findings under subsection (10) the court also relied on Kuehn's and Hamilton's hearsay testimony that Taryn's sister often had to take Trudy from the home when Taryn was drinking, and that Trudy often had to find food and a place to sleep when Taryn was drinking. But even if the court did erroneously rely on hearsay in making its findings under AS 47.10.011(8) and (10), its findings under subsection (6) did not rely on hearsay. Because we may affirm on any ground supported by the record,[16] we need not reach the court's findings under AS 47.10.011(8) and (10); we instead affirm the court's determination that Trudy was a child in need of aid under AS 47.10.011(6).[17]

---

[16] *Gilbert M. v. State*, 139 P.3d 581, 586 (Alaska 2006) ("We may affirm the superior court on any basis supported by the record, even if that basis was not considered by the court below or advanced by any party." (citing *Sopko v. Dowell Schlumberger, Inc.*, 21 P.3d 1265, 1269 (Alaska 2001))).

[17] We take this opportunity, however, to emphasize the difference between the evidentiary rules applicable to the different phases of CINA proceedings. Unless otherwise specified in the CINA Rules, the ordinary Alaska Rules of Evidence apply to CINA proceedings. CINA Rule 9(a). The rules governing probable cause (temporary custody) hearings, disposition hearings, and permanency hearings contain exceptions to this rule, allowing the court to admit hearsay evidence which would "be otherwise inadmissible under the Evidence Rules if the hearsay is probative of a material fact, has circumstantial guarantees of trustworthiness, and the appearing parties are given a fair opportunity to meet it." CINA Rules 10(b)(3), 17(e), 17.2(d).

The procedural rules for adjudication hearings, on the other hand, contain no such allowance for otherwise inadmissible hearsay. CINA Rule 15. The court is therefore bound to follow the Rules of Evidence in an adjudication hearing and may not admit or rely upon ordinarily inadmissible hearsay, even if it was admitted at the

(continued...)

## V. CONCLUSION

Because there was no violation of Taryn's right to due process, we AFFIRM the superior court's decision.

---

[17]    (...continued) probable cause hearing for the same case. *See Jeff A.C., Jr. v. State*, 117 P.3d 697, 709-10 (Alaska 2005) (Bryner, C.J., concurring) (noting that at termination trial, evidence relating to adjudication of CINA status must comply with formal hearsay exceptions laid out in Rules of Evidence). It is imperative that courts distinguish between these standards and apply the evidentiary rule appropriate to the proceeding at hand. *See also* CINA Rule 18(f) (providing a limited hearsay exception in termination proceedings for evidence other than that used "to prove that the child has been subjected to conduct or conditions described in AS 47.10.011").