*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, e-mail corrections@appellate.courts.state.ak.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| In the Matter of | ) | |
| | ) | Supreme Court No. S-15251 |
| CANDACE A., a Minor. | ) | |
| | ) | Superior Court No. 4BE-13-00013 CN |
| | ) | |
| | ) | O P I N I O N |
| | ) | |
| | ) | No. 6946 - August 22, 2014 |

Petition for Review from the Superior Court of the State of Alaska, Fourth Judicial District, Bethel, Charles W. Ray, Jr., Judge.

Appearances: David T. Jones, Senior Assistant Attorney General, Anchorage, and Michael C. Geraghty, Attorney General, Juneau, for Petitioner State of Alaska. Rachel Cella, Assistant Public Defender, Anchorage, and Quinlan Steiner, Public Defender, Anchorage, for Respondent E.A. William T. Montgomery, Assistant Public Advocate, Bethel, and Richard Allen, Public Advocate, Anchorage, for Respondent D.A.

Before: Fabe, Chief Justice, Winfree, Stowers, Maassen, and Bolger, Justices.

MAASSEN, Justice.

## I. INTRODUCTION

The superior court adjudicated Candace[1] a child in need of aid because she had been sexually abused by her adoptive brother. The superior court nonetheless ordered that Candace be returned to her parents' home, holding that the Department of Health and Social Services, Office of Children's Services (OCS), had failed to present "qualified expert testimony" as required by the Indian Child Welfare Act (ICWA) to support a finding that she would likely suffer serious physical or emotional harm in her parents' custody. We conclude that the superior court's failure to accept OCS's proposed expert witnesses as qualified was error, and we therefore vacate the order placing Candace with her parents.

## II. FACTS AND PROCEEDINGS

### A. Candace's History

Candace is a 17-year-old girl from a small village in southwestern Alaska.[2] She entered the foster care system when she was two years old and was adopted by her great-aunt and great-uncle — Emma and Douglas — when she was 11.

---

[1]    We use pseudonyms to protect the family's privacy.

[2]    Candace turns 18 in August 2014. Recognizing that this case may be moot, we conclude that the public interest exception to the mootness doctrine applies. In deciding whether to hear a moot appeal, we weigh various considerations: "(1) whether the disputed issues are capable of repetition, (2) whether the mootness doctrine, if applied, may cause review of the issues to be repeatedly circumvented, and (3) whether the issues presented are so important to the public interest as to justify overriding the mootness doctrine." *Peter A. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 146 P.3d 991, 996 (Alaska 2006). We apply the exception to this case because the question of expert qualifications in ICWA cases is important to the public interest and is likely to arise repeatedly.

In the fall of 2012, Candace's teacher noticed she was withdrawn, had stopped talking to her friends, and seemed depressed. Candace spent about two weeks sleeping on friends' couches, including one night when she stayed with her teacher. One day Douglas came to school and told Candace to come home or he would call the village public safety officer to bring her home. Candace locked herself in the girls' bathroom, where she slammed her head against the floor and walls. She texted her teacher and said that she couldn't go back home because "bad things [were] happening." The teacher reported this to the school principal and OCS. A state trooper and an OCS worker spoke with Candace, who reported that she had been sexually abused by her adoptive brother. A few days later Douglas and Emma agreed to send Candace to a boarding school in Bethel.

Candace repeated her reports of abuse while at boarding school, telling the school principal that her home "was a bad place" and she did not want to live there. She said that Douglas and Emma hid the "bad things" she reported. The "dorm parent" at the boarding school gave Candace a journal, in which Candace wrote other details about abuse at home. When the school principal contacted OCS about what Candace described, Candace again locked herself in the bathroom, destroyed the journal, and threatened to commit suicide; the principal had to call the police to remove her from the bathroom. Candace refused to talk about what she had written in her journal or to give additional details about the abuse.

Candace returned to her village during the 2012 winter break. OCS worked with Douglas and Emma to find a safe place for Candace to stay while she was home, away from her adoptive brother. Candace was supposed to stay with Douglas's sister but actually spent some of her time at her parents' house. When she returned to Bethel after winter break, she told the school principal that one of her uncles came into her bedroom

while intoxicated and tried to "touch her in her private areas down low and also tried to take off her pants and was kissing her." Candace told the principal that her parents did not believe this occurred and refused to report anything to OCS because they did not want Candace's uncle to go to jail. The school principal reported Candace's allegations of abuse to OCS and the Bethel Police Department.

In February 2013, Candace was expelled from the boarding school dorms because of a drinking incident. She and her girlfriend went to the airport in Bethel but were picked up by the police and brought to the OCS office, where Candace told an OCS worker she was afraid to go back to her village because her adoptive brother sexually abused her. OCS contacted Emma, who suggested that Candace spend the night at an aunt's house in Bethel.

OCS took emergency custody of Candace the next day. In a forensic interview, Candace said that her adoptive brother had had sexual intercourse with her a year or two earlier and that he had attempted to do so several times since, including during the winter break she spent in the village.

The OCS social worker, Barbara Cosolito, then spoke with Douglas and Emma. Douglas was skeptical of Candace's allegations. He agreed that his son (Candace's adoptive brother) could stay someplace else in the village when Candace was home, but he wanted his son to be able to come over for family meals. Cosolito did not believe this would be safe for Candace, who could be assaulted again, feel re-victimized or traumatized, and engage in more self-harming behaviors. Cosolito therefore drafted an emergency petition to adjudicate Candace a child in need of aid. Douglas and Emma stipulated that probable cause existed for temporary OCS custody pending adjudication. The superior court committed Candace to OCS's temporary custody and authorized

placement in a foster home in Bethel. Candace continued to attend boarding school while in foster care.

OCS referred Candace to a therapist. Candace told the therapist that she cut herself, and that she engaged in other activities she knew were dangerous such as riding four-wheelers with strangers after drinking alcohol and smoking marijuana. The therapist diagnosed her with minor chronic depression, PTSD, sexual abuse, alcohol abuse, and cannabis abuse.

In March 2013, Candace's OCS caseworker took her to the emergency room, fearing she had overdosed on antidepressants. Following an evaluation, Candace was admitted to North Star Behavioral Health in Anchorage. The doctors at North Star agreed with the diagnoses of Candace's therapist and also diagnosed her with reactive attachment disorder, oppositional defiant disorder, and probable ADHD.

Candace's behavior worsened while she was at North Star. She acted aggressively toward the staff and threatened to harm herself as well. The superior court held a placement review hearing in April 2013 and denied OCS's request to continue Candace's placement there. OCS then moved Candace to a group home run by Presbyterian Hospitality House in Palmer.

**B.    Expert Testimony At The Adjudication Hearing**

The superior court held an adjudication hearing over the course of several days, from May to early July 2013, to determine whether Candace was a child in need of aid and whether removal from her family home continued to be justified. OCS called Barbara Cosolito to provide the expert testimony ICWA requires to show "that the continued custody of the child by the parent . . . is likely to result in serious emotional

or physical damage to the child."[3] As we will explain further, the Bureau of Indian Affairs (BIA) has defined the ICWA phrase "qualified expert witnesses" to include lay persons with "substantial experience and knowledge regarding relevant Indian social and cultural standards" and "professional persons" who have "substantial education in the area of [their] specialty."[4] It was against these BIA standards that the superior court judged the qualifications of OCS's proposed experts.

Cosolito testified that she was the initial assessment supervisor at OCS's Bethel office, a position she had held for over two years. She testified that she supervised eight people; that the Bethel office processed "anywhere from 60 to 104 [cases] in a month"; that a "[h]undred percent" of those cases involved Alaska Native families; and that it was her responsibility to provide "supervisory support over those people . . . [f]or all of those cases." Her responsibilities included not only daily supervision of the other OCS employees but also "staff[ing] cases with them when they're out in the village to help them either identify safety threats or if there are no safety threats to identify the safety threshold and whether or not we need a . . . safety plan." As supervisor she made the final decisions about whether OCS should assume custody of a child. Another part of her duties was to provide expert testimony — she testified that she had been qualified as an expert witness in the area of child welfare

---

[3] 25 U.S.C. § 1912(e) (2012) ("No foster care placement may be ordered in such proceeding in the absence of a determination, supported by clear and convincing evidence, including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child.").

[4] *Marcia V. v. State, Office of Children's Servs.*, 201 P.3d 496, 504 (Alaska 2009) (citing Guidelines for State Courts; Indian Custody Proceedings, 44 Fed. Reg. 67,584, 67,593 (Nov. 26, 1979)).

"numerous times" and had never been offered and found *not* qualified.  Finally, she testified that as supervisor she participated in "collaboration efforts between the tribes and OCS."

As for her prior experience, Cosolito testified that before becoming an OCS supervisor she spent a year as "an initial assessment line worker" in the same office, where she "received the reports of harm . . . and . . . went out and assessed the situations" for safety.  Before that she served for four years as an "administrator/social worker for a charter school in [the] rural community of Camp Verde, Arizona."  She "[o]versaw the charter school"; "worked with the Yavapai-Apache Tribe in correlating grants and services for their children in our school"; worked with students "in developing [individual education plans and] behavioral plans[;] work[ed] with families that were either homeless or needing assistance"; and collaborated with "the local behavioral health clinic" on assisting children with behavioral issues.

As for her education, Cosolito testified that she had both a bachelor's degree and a master's degree in social work.  Each level of education required a 500-hour internship:  for one she worked for Arizona Child Protective Services, "both in the initial assessment unit and also in the family services unit"; for the other she worked for the same agency in "kinship care," which she defined as "family members raising other family members' children."  She testified that she received "original skills" training when she was first hired by OCS, including training in racism and ICWA, and received further supervisory training when she advanced in the agency.  She testified that to maintain her license she receives 45 hours of continuing education every two years in subjects that in the past have included substance abuse, child abuse, and the "impact of adverse childhood experiences."  In response to questions from the judge, Cosolito disclaimed a special expertise in Alaska Native cultural standards but said she considered herself

a "lay expert" in the area of "delivery of child and family services . . . to Indians" based on both her work in Arizona and her three years with OCS in Bethel. She acknowledged that whether her experience was "substantial" for purposes of the BIA standards depended on one's point of view, but she also testified that there were only a few OCS workers who had been in the region longer than she had, as the OCS "turnover rate is pretty high" statewide and "most workers are one to two years in this region."

Douglas and Emma objected to Cosolito's qualification as an expert on grounds that she lacked substantial experience and knowledge regarding the relevant tribal customs and social standards (thus failing to meet one part of the BIA guidelines) and that she was not a "professional" (thus failing to meet another part of the BIA guidelines). The superior court agreed with these objections. It found that Cosolito was not qualified because she lacked "credentials which support the expression of opinions specific to the Native cultural issues in dispute," and that, as a social worker, she was not a "professional" for purposes of ICWA.

OCS then gave notice of another proposed expert, Nancy Kirchoff, who was Candace's clinical social worker at Presbyterian Hospitality House and who, like Cosolito, was expected to testify in support of a decision "that it is contrary to the welfare of the child to return her to the home at this time." Kirchoff became a Licensed Clinical Social Worker in Alaska in 1999 and testified that she had been working in that capacity at Presbyterian for about two years. She worked with children who had been diagnosed as seriously emotionally disturbed, which meant conducting client interviews, collecting collateral information, and completing behavioral health assessments, then developing treatment plans based on those assessments. She testified that she also conducts individual and group psychotherapy sessions; her treatment of Candace involved both these types of therapy. Kirchoff testified that she also maintains a private

practice performing child custody investigations and adoption home-studies. Her work history also included, as most relevant here, four years as a mental health clinician with the Alaska Department of Corrections, seven years as a social worker with OCS, a year with a juvenile assessment center in Wasilla as a "[c]linician providing psycho-social assessments for school-aged children," a year as a clinician at Southcentral Counseling in Anchorage providing school-based services to emotionally disturbed children, and four years as a public school social worker in Minnesota. Like Cosolito, Kirchoff had both bachelor's and master's degrees in social work; her master's studies involved working with children with "social-emotional disorders." Kirchoff testified that she took continuing education courses in a variety of topics, including substance abuse and drug-endangered children. She testified that she had been qualified as an expert in prior court proceedings 10 or 15 times while employed by OCS, in categories that included "ICWA, child protection, and children's mental health," and particularly whether under the ICWA standards it was "contrary to the welfare of the child to return home."

Douglas and Emma again objected that Kirchoff was not qualified to give the expert testimony required by ICWA, and the court again agreed with their objections, finding that Kirchoff lacked "the necessary expertise or knowledge of the Indian culture that's at issue here." The court did qualify Kirchoff as an expert with regard to Candace's treatment plan and did allow her to testify about the specifics of that plan, but it refused to consider her testimony as supporting a finding of likely harm under ICWA.

## C. The Adjudication Hearing

Ultimately, the superior court found that Candace was a child in need of aid due to sexual abuse by her adoptive brother, including a sexual assault in the home during the most recent winter break. However, in the absence of qualified expert testimony, the superior court held that OCS failed to meet its burden of showing that

Candace was likely to suffer serious emotional or physical harm if she were returned to her parents' custody. The court concluded, therefore, that Candace should be returned home, albeit under OCS supervision "in order that appropriate safeguards are developed and implemented to ensure [Candace's] safety from [her adoptive brother]."

OCS filed a motion to stay and a petition for review, both of which we granted. The petition asks that we review the superior court's conclusion that OCS's two proposed witnesses, Cosolito and Kirchoff, were not "qualified experts" for purposes of ICWA, 25 U.S.C. § 1912(e).[5]

## III.    STANDARDS OF REVIEW

When reviewing a superior court's decision to exclude proposed expert testimony under ICWA, we apply two different standards of review. First, "whether the expert testimony requirement of ICWA is satisfied is a pure question of law to be

---

[5]    The petition also asks us to review whether the superior court erred when it apparently relied on arguments of counsel rather than evidence to find that Douglas and Emma had undergone "a sea change in their views" about whether their son actually posed a danger to Candace, something they had earlier denied. We need not address this issue, however, because our disposition of the expert witness issue would require a remand in any event.

reviewed de novo."[6]  Second, "[a] trial court's decision to admit expert testimony is reviewed for an abuse of discretion."[7]

## IV.    DISCUSSION

We conclude that the superior court's refusal to qualify OCS's proposed expert witnesses was based on two legal errors:  first, overlooking controlling law that expertise in Alaska Native culture is not required when the issues presented do not implicate cultural biases; and second, failing to recognize that well-educated and experienced social workers are "professional persons."[8]

---

[6]    *Christina J. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 254 P.3d 1095, 1104 (Alaska 2011); *see also Thea G. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 291 P.3d 957, 962 (Alaska 2013) ("Whether expert testimony presented at trial satisfies the requirements of ICWA is a legal question that we review de novo."); *Lucy J. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 244 P.3d 1099, 1111 (Alaska 2010); *L.G. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 14 P.3d 946, 950 (Alaska 2000) ("[A] determination of whether the trial court's findings comport with the requirements of ICWA involves a question of law and will be reviewed de novo.").

[7]    *Thea G.*, 291 P.3d at 962.

[8]    We reject the respondents' arguments that the petition for review was untimely because it was not filed within ten days of the challenged evidentiary rulings but rather within ten days of the adjudication order.  The adjudication order expressly relied on OCS's failure to present the testimony of witnesses who satisfied the BIA guidelines for qualified experts.  An adjudication order based on erroneous evidentiary rulings is a proper subject of discretionary review.  We also reject Emma's argument that OCS waived its challenge with regard to Kirchoff because it proceeded with her testimony, as limited by the court, rather than attempting to elicit a better foundation for her opinions or requesting a stay and continuance.  The transcript clearly shows OCS's position and the superior court's rejection of it; there is no evidence that OCS intended to abandon the issue by proceeding with Kirchoff's testimony.

**A.    ICWA And Alaska's CINA Rules Require That A Decision To Remove An Indian Child From Her Home Be Supported By Qualified Expert Testimony.**

ICWA reflects a national purpose "to protect the best interests of Indian children and to promote the stability and security of Indian tribes and families"; the act seeks to accomplish this purpose by imposing "minimum Federal standards for the removal of Indian children from their families and the placement of such children in foster or adoptive homes."[9]  Accordingly, ICWA provides that any decision to place an Indian child with someone other than the child's parent or Indian custodian must be "supported by clear and convincing evidence, *including testimony of qualified expert witnesses*, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child."[10]

These requirements of federal law are reflected in Alaska's child-in-need-of-aid rules.  Under CINA Rule 10(c)(3), the court may approve the removal of an Indian child from her home only if either "(A) . . . removal . . . is necessary to prevent imminent physical damage or harm to the child; or (B) . . . there is clear and convincing evidence, including testimony of qualified expert witnesses, that the child is likely to suffer serious emotional or physical damage if left in the custody of the parent or Indian custodian."

The critical phrase "qualified expert witnesses" is defined neither in ICWA nor in Alaska's CINA rules.  But as noted above, the federal BIA has provided guidelines describing the witnesses who are "most likely" to meet ICWA's expert requirements:

---

[9]     *Native Vill. of Tununak v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 303 P.3d 431, 441 (Alaska 2013) (quoting 25 U.S.C. § 1902 (2006)).

[10]     25 U.S.C. § 1912(e) (2012) (emphasis added).

(1) a member of the child's tribe recognized by the tribal community as knowledgeable in tribal customs pertaining to family organization and childrearing practices, (2) a lay expert with substantial experience and knowledge regarding relevant Indian social and cultural standards and childrearing practices and the delivery of child and family services to Indians, or (3) [a] professional person having substantial education in the area of his or her specialty.[11]

We have held that the required expert testimony may be aggregated with other expert testimony or with the testimony of lay witnesses to support the conclusion that a parent's continued custody of the child is likely to cause the child serious harm.[12]

## B. The Superior Court Erred In Its Interpretation Of ICWA's Expert Witness Requirements.

The superior court found that Cosolito and Kirchoff failed to satisfy either of two arguably relevant BIA guidelines. First, the superior court found that they failed to satisfy the second BIA guideline — as lay experts "with substantial experience and knowledge regarding relevant Indian social and cultural standards and childrearing practices and the delivery of child and family services to Indians." But we have repeatedly held that expertise in Alaska Native culture is not necessarily required under ICWA. "Congress intended ICWA to prevent Native children from being separated from their families solely on the basis of testimony from social workers who were unable to 'distinguish between cultural variations in child-rearing practices and actual abuse or

---

[11] *Marcia V. v. State, Office of Children's Servs.*, 201 P.3d 496, 504 (Alaska 2009) (alteration in original, emphasis removed) (citing Guidelines for State Courts; Indian Child Custody Proceedings, 44 Fed. Reg. 67,584, 67,593 (1979)) (internal quotation marks omitted).

[12] *Thea G.*, 291 P.3d at 964; *L.G. v. State, Dep't of Health & Soc. Servs.*, 14 P.3d 946, 950 (Alaska 2000).

neglect.' "[13] Thus, "[w]hen the basis for termination is unrelated to Native culture and society and when any lack of familiarity with cultural mores will not influence the termination decision or implicate cultural bias in the termination proceeding, the qualifications of an expert testifying under [ICWA] § 1912(f) need not include familiarity with Native culture."[14]

Even assuming that Cosolito and Kirchoff lacked expertise in Alaska Native culture, that would not disqualify them as experts under the circumstances of this case, because whether a child is likely to be harmed by exposure to sexual abuse in the home does not depend on particular cultural mores. In *L.G.* we held that evidence of the mother's "addictive and habitual use of alcohol and cocaine," causing the physical neglect of her children, showed that the children were "at a clear risk of future harm if returned to [the mother's] custody," a finding that "did not require testimony from an expert in Native culture."[15] In *Marcia V.*, where the termination order "relied on evidence of Marcia's addictions, violent behavior, incarceration, inability to provide a stable home, neglect, exposure of [the child] to sex offenders, domestic violence in the home, and abandonment," we observed that "[n]othing in the trial record or in Marcia's appeal suggests that cultural bias might have been at issue, or that considering the

---

[13] *Marcia V.*, 201 P.3d at 504 (quoting *L.G.*, 14 P.3d at 952-53).

[14] *Thea G.*, 291 P.3d at 964 (quoting *Marcia V.*, 201 P.3d at 503) (internal quotation marks omitted). *See also Christina J. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 254 P.3d 1095, 1111 (Alaska 2011); *Lucy J. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 244 P.3d 1099, 1118 (Alaska 2010); *L.G.*, 14 P.3d at 952-953. Although these cases involve termination proceedings, we see no reason why a different standard would apply to a case like this one involving an adjudication that a child is a child in need of aid.

[15] *L.G.*, 14 P.3d at 953-54.

appropriate tribal standards of child care would affect the disposition of the case[; t]hus, the [expert witness's] lack of familiarity with Native culture cannot be considered a deficiency in her qualifications to testify under ICWA § 1912(f)."[16] The superior court overlooked the significance of these decisions when it disqualified Cosolito and Kirchoff because of their purported lack of expertise in Alaska Native culture.

The superior court also erred when it credited Douglas's argument that social workers are not "professionals" under the third BIA guideline ("[a] professional person having substantial education in the area of his or her specialty"), noting its "agree[ment] with the characterization of [the 'professional'] class of experts put forward by Father." Douglas's argument relies on the definition of "professional" in *Black's Law Dictionary*: "A person who belongs to a learned profession or whose occupation requires a high level of training and proficiency."[17] Douglas also notes, again quoting *Black's*, that the three traditional "learned professions were theology, law and medicine."[18] But social work, like the traditional "learned professions," "requires a high level of training and proficiency," and it is well recognized as a profession today.

Social work in Alaska has all the earmarks of a profession. The law requires a state licence for the practice of social work.[19] A licensed clinical social worker must have a master's or doctoral degree in social work, must have completed at least two years of continuous full-time employment in post-graduate clinical social work, must

---

[16]    *Marcia V.*, 201 P.3d at 503.

[17]    BLACK'S LAW DICTIONARY 1329 (9th ed. 2009).

[18]    *Id.*

[19]    *See City of Kenai v. Friends of Recreation Ctr., Inc.*, 129 P.3d 452, 459 (Alaska 2006) (noting that professional occupations often have licensing requirements).

have good moral character and be "in good professional standing," must provide "three professional references" acceptable to the licensing board, and must pass the licensing examination.[20] Social workers are subject to a code of ethics,[21] including confidentiality requirements,[22] and to maintain their licenses must take continuing education courses, including "professional ethics."[23] Social workers who do not conform to "minimum professional standards" are subject to discipline.[24] Alaska statutes and rules reflect throughout a common understanding that social workers are professionals.[25] And in our

---

[20]    AS 08.95.110(a).

[21]    12 Alaska Administrative Code (AAC) 18.150 (2014) ("A social worker licensed in this state shall adhere to the code of ethics adopted by the Board of Social Work Examiners under this section.").

[22]    AS 08.95.900(a) ("A licensed social worker . . . may not reveal to another person a communication made to the licensee by a client about a matter concerning which the client has employed the licensee in a professional capacity.").

[23]    AS 08.95.040(a) ("Continuing education requirements that must be satisfied before the first biennial renewal of a person's license must include a minimum of 45 hours of education or training with a minimum of three hours in professional ethics, six hours in substance abuse, and six hours in cross-cultural education that includes issues relating to Alaska Natives. After the first biennial renewal of a license, continuing education requirements for that person's license renewal must include three hours in professional ethics, six hours in substance abuse, and six hours in cross-cultural education, three hours of which must include issues relating to Alaska Natives.").

[24]    AS 08.95.050(8).

[25]    *See, e.g.*, AS 47.30.915(11) (defining "mental health professional" as including "a clinical social worker" licensed in Alaska); AS 08.95.120(a)(2)-(13) (describing requirements for licensing by credentials, including "professional references" and clearance by any governing "professional social work association"); AS 08.95.900(a) (describing a licensed social worker's confidentiality obligations where a client "has employed the licensee in a professional capacity"); Alaska R. Prof.
(continued...)

caselaw we have strongly implied that social workers may be qualified experts under the third BIA guideline as long as they have "expertise beyond the normal social worker qualifications."[26]

Applying the correct meaning of the phrase "professional person having substantial education in the area of his or her specialty," we hold that Cosolito and Kirchoff should have been qualified as experts under the third BIA guideline. As social workers, both were "professional persons." Both had "substantial education in the area of [her] specialty": master's degrees in social work, internships in relevant subject areas as required for their degrees, agency training, and continuing professional education. The experience of both witnesses further demonstrated the required "expertise beyond the normal social worker qualifications." Cosolito described her work as an OCS supervisor overseeing hundreds of cases, identifying safety threats, and having ultimate responsibility for custody decisions; as an OCS line worker assessing reports of harm;

---

[25](...continued)
Conduct 2.1 cmt. 4 ("Matters that go beyond strictly legal questions may also be in the domain of another profession," such as "psychiatry, clinical psychology or social work.").

[26]     *Marcia V. v. State, Office of Children's Servs.*, 201 P.3d 496, 504-05 (Alaska 2009) (quoting H.R. Rep. No. 95-1386, at 22 (1978), *reprinted in* 1978 U.S.C.C.A.N. 7530, 7545) (internal quotation marks omitted) (holding that an OCS supervisor who was not qualified under the first two subparts of the BIA guidelines "would have had to qualify by virtue of substantial education in the area of her specialty" under the "professional" subpart); *see David S. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 270 P.3d 767, 782 n.48 (Alaska 2012) (noting in dictum that "it seems most unlikely that [an OCS supervisor] would not qualify" as an expert "given [her] high degree of experience and previous qualification as an expert"); *see also In re M.J.J., J.P.L.& J.P.G. v. State*, 69 P.3d 1226, 1228 (Okla. Civ. App. 2003) ("In the absence of implication of cultural bias, the expert witness may be a social worker who possesses expertise beyond the normal social worker qualifications.").

and as a school administrator and social worker in Arizona working with the diverse behavioral and education needs of students and their families. Her testimony demonstrated regular and in-depth exposure to the very types of family and behavioral issues that were central to Candace's case, including the possibility that Candace would be assaulted again, be re-traumatized, and engage in more self-destructive behavior.

Kirchoff appeared even more amply qualified to testify about the risks of serious emotional or physical harm if Candace were returned to her home. Kirchoff had a lengthy work history as a mental health clinician, working with children with emotional and behavioral problems in a variety of institutional and agency settings, as well as a private practice of custody investigations and adoption home-studies. As Candace's own clinician, treating her in both individual and group therapy, Kirchoff was uniquely qualified to testify with authority about Candace's susceptibility to emotional harm. Though the superior court did not consider Kirchoff's testimony in support of the required findings under ICWA, the testimony she was allowed to give proved directly relevant to the issue: she testified that Candace was at risk of reverting to dangerous substance-abuse behaviors if she were returned to her village, and that if she reverted to those behaviors she would make herself more vulnerable to harm by others. Kirchoff was also concerned that despite some progress in developing healthy coping skills, Candace was not yet "able to practice them without a lot of prompts" and was therefore still at risk of harming herself.

The testimony of both these well-qualified witnesses would have been highly relevant to the finding under ICWA § 1912(e) that the superior court was obliged to make. Although we reverse the court's exclusion of the testimony because of its misinterpretation of the governing standards, we observe that, under a correct application

of the law, it would have been an abuse of discretion to exclude the witnesses' testimony.[27]

## V.   CONCLUSION

We REVERSE the superior court's rulings on whether OCS's two proffered witnesses were qualified experts for purposes of 25 U.S.C. § 1912(e). We VACATE the portion of the July 26, 2013 adjudication order placing Candace with her parents and REMAND for further proceedings consistent with this opinion.

---

[27]   Because of our disposition of this issue, we need not reach the parties' other arguments about the superior court's findings under 25 U.S.C. § 1912(e).