NOTICE

*Memorandum decisions of this court do not create legal precedent. A party wishing to cite such a decision in a brief or at oral argument should review Alaska Appellate Rule 214(d).*

THE SUPREME COURT OF THE STATE OF ALASKA

| | |
|---|---|
| KENT K., | Supreme Court No. S-15708 |
| Appellant, | |
| | Superior Court Nos. 3AN-12-00226/ |
| v. | 00227/00228 CN |
| | |
| STATE OF ALASKA, DEPARTMENT | MEMORANDUM OPINION |
| OF HEALTH & SOCIAL SERVICES, | AND JUDGMENT* |
| OFFICE OF CHILDREN'S SERVICES, | |
| | No. 1569 – February 3, 2016 |
| Appellee. | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Eric A. Aarseth, Judge.

Appearances: Olena Kalytiak Davis, Anchorage, for Appellant. Dario Borghesan, Assistant Attorney General, Anchorage, and Craig W. Richards, Attorney General, Juneau, for Appellee. Randall S. Cavanaugh, Kalamarides & Lambert, Anchorage, for Guardian Ad Litem.

Before: Stowers, Chief Justice, Fabe, Winfree, and Bolger, Justices. [Maassen, Justice, not participating.]

I.     INTRODUCTION

A father appeals the termination of his parental rights to his three Indian children, primarily arguing that the trial court committed legal and factual errors in

---

\*     Entered under Alaska Appellate Rule 214.

finding that active efforts had been made to prevent the breakup of the Indian family and that placing the children in his custody likely would result in serious harm to them. We affirm the trial court's decision.

## II.    BACKGROUND

Kent K. and Casey W.[1] are, relevant to this appeal, the biological parents of three children born in 2006, 2007, and 2010. Although it was not made evident until after the trial court terminated Kent's parental rights, Casey has been a member of the Asa'carsarmiut Tribe since 1994 and the children fall within the Indian Child Welfare Act's (ICWA)[2] definition of an "Indian child."[3]

When Kent and Casey parted sometime after their youngest child was born, Kent maintained physical custody of the children. Kent later began a relationship with Veronica S., who moved in with Kent and the children. Veronica's own children were the subject of child in need of aid proceedings; the Office of Children's Services (OCS) apparently was seeking to terminate her parental rights as a result of her substance abuse.

In July 2012 OCS became involved with Kent and his children, concerned with reports of domestic violence and alcohol use in the home, Veronica's presence in the home, and Kent's past failure to obtain a mental health assessment. OCS filed a non-emergency petition for an adjudication that the children were in need of aid and for temporary legal custody. OCS noted that Casey might be affiliated with the

---

[1]    Pseudonyms are used for family members and some other persons involved in this matter.

[2]    25 U.S.C. §§ 1901–1963 (2012). ICWA establishes "minimum Federal standards for the removal of Indian children from their families and [for] the placement of such children in foster or adoptive homes which will reflect the unique values of Indian culture." 25 U.S.C. § 1902.

[3]    *See* 25 U.S.C. § 1903(4) (defining "Indian child").

Asa'carsamiut Tribe and that the children were believed to be Indian children affiliated with the Tribe. OCS did not seek to remove the children from Kent's home at that time, but rather implemented a safety plan centered on a family friend living with the family to ensure against substance abuse and domestic violence in the home.

In September the Tribe attempted to intervene. Because the Tribe's documents were ambiguous about Casey's tribal membership and the Tribe did not respond to the trial court's request for clarification, in November the trial court denied the intervention motion without prejudice. At about the same time the trial court granted OCS's motion to remove the children from Kent's home. Shortly thereafter the parties stipulated that the children were in need of aid and should be in OCS's temporary custody; the stipulation indicated that the children "are not Indian children . . . at this time."

In August 2013 OCS petitioned to terminate Kent's and Casey's parental rights, stating that the children were "not believed to be Indian children" and setting out the grounds for termination.[4] A few days before the August 2014 termination trial Casey

---

[4] The grounds and standards for terminating parental rights are provided in Alaska Child in Need of Aid (CINA) Rule 18, governed primarily by Alaska Statutes but also, in the case of an Indian child, by federal requirements under ICWA. *See* CINA Rule 18 (referencing requirements in AS 47.10.011, 47.10.080, and 47.10.086, and providing, in the case of Indian children, protocols under subsections (c)(2)(B) and (c)(4) comporting with ICWA, 25 U.S.C. § 1912(d) and (f), respectively).

In a case not involving an Indian child, parental rights may be terminated at trial if OCS shows the following by clear and convincing evidence: (1) the child has been subjected to conduct or conditions enumerated in AS 47.10.011; (2) the parent has not remedied the conduct or conditions that place the child at substantial risk of harm or has failed within a reasonable time to remedy the conduct or conditions so that the child would be at substantial risk of physical or mental injury if returned to the parent; and (3) reasonable efforts have been made to provide family support services designed to
(continued...)

relinquished her parental rights to the children, stating that "to the best of [her] knowledge, the children are not eligible for membership in an Indian tribe, and neither parent is a member of an Indian tribe." After trial the court terminated Casey's parental rights based on her relinquishment. Shortly thereafter it terminated Kent's parental rights.

In its order terminating Kent's parental rights, the trial court first stated that it had made findings at various stages of the case that the children were not Indian children under ICWA, that no party had presented contrary information at trial or asked

---

[4] (...continued)
prevent the breakup of the family. OCS also is required to show by a preponderance of the evidence that the child's best interests would be served by termination of parental rights. CINA Rule 18; AS 47.10.088.

In contrast, parental rights to an Indian child may be terminated at trial only if OCS makes the following showings:

(1) OCS must show by clear and convincing evidence that: (a) the child has been subjected to conduct or conditions enumerated in AS 47.10.011; (b) the parent has not remedied the conduct or conditions that place the child at substantial risk of harm or has failed within a reasonable time to remedy the conduct or conditions so that the child would be at substantial risk of physical or mental injury if returned to the parent; and (c) active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family.

(2) OCS must show beyond a reasonable doubt, including qualified expert testimony, that continued custody of the child by the parent is likely to result in serious emotional or physical damage to the child.

(3) OCS must show by a preponderance of the evidence that the child's best interests would be served by termination of parental rights. CINA Rule 18; AS 47.10.088; 25 U.S.C. § 1912(d), (f).

the court to reconsider its earlier rulings,[5] and that the children were not Indian children under ICWA. It then found the predicate grounds for terminating Kent's parental rights.[6]

Although still represented by an attorney, Kent filed a pro se motion for reconsideration, contending that the trial court had overlooked that the children actually were Indian children under ICWA. He attached numerous documents from the Tribe — dated post-trial — supporting his contention, including statements that the children were enrolled tribal members as of September 11, 2014. The trial court rejected the motion on the ground that Kent could not file pro se motions while represented by an attorney.

Kent, through his trial attorney, appealed the termination decision on the grounds that the trial court's finding for each of the four termination prongs was clearly erroneous. But, through a new attorney, Kent instead argued in his opening brief that the children were Indian children under ICWA and therefore (1) the trial court, aided by OCS's and the guardian ad litem's alleged failures to recognize ICWA applied to the case, had erred by not applying ICWA standards throughout the proceedings and (2) Kent's trial attorney had rendered ineffective assistance of counsel by failing to demonstrate that the children were Indian children under ICWA.

OCS then requested that we remand for the limited purpose of allowing the trial court to apply ICWA's standards to the evidence presented at trial and issue a new decision on the termination petition. Kent argued that the remand must be for the trial court to re-start the proceedings so that each and every step of the proceedings would

---

[5]     *Cf. Bruce L. v. W.E.*, 247 P.3d 966, 977 (Alaska 2011) (explaining that when Indian child status is at issue the "burden to produce the necessary evidence to establish that [the child] was a member of or eligible for membership in the Tribe" is on party asserting ICWA's applicability).

[6]     *See supra* note 4. The court found the children were in need of aid under AS 47.10.011(6) (risk of physical harm), (8) (risk of mental injury), (9) (neglect), and (10) (parental substance abuse).

comply with ICWA.  We remanded for the trial court to issue supplemental findings of fact and conclusions of law on OCS's termination petition, applying, where necessary, ICWA standards to the evidence presented at trial.

The trial court invited new closing arguments by the parties and entered supplemental findings and conclusions in May 2015.  In connection with the two necessary ICWA findings for parental rights termination, beyond its original findings, the trial court found clear and convincing evidence that OCS had made active efforts designed to prevent the breakup of the Indian family and evidence beyond a reasonable doubt, including expert testimony, that Kent's continued custody of the children would likely result in serious emotional or physical damage to the children.  Adding these findings to its earlier findings, the trial court terminated Kent's parental rights to the three children.

Kent then renewed his appeal, primarily arguing that the trial court's new ICWA-based findings are both legally unsound and clearly erroneous.

## III.    STANDARD OF REVIEW

Whether ICWA's active efforts requirement is satisfied and whether a child likely would be harmed if returned to the parent present mixed questions of law and fact.[7] We review the trial court's factual findings for clear error and reverse only if left with "a definite and firm conviction that a mistake has been made."[8]  We use our independent

---

[7]    *E.A. v. State, Div. of Family & Youth Servs.*, 46 P.3d 986, 989 (Alaska 2002) (citing *N.A. v. State, Div. of Family & Youth Servs.*, 19 P.3d 597, 600-01 (Alaska 2001); *L.G. v. State, Dep't of Health & Soc. Servs.*, 14 P.3d 946, 949-50 (Alaska 2000)).

[8]    *Maisy W. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 175 P.3d 1263, 1267 (Alaska 2008) (quoting *Brynna B. v. State, Dep't of Health & Soc. Servs.*, 88 P.3d 527, 529 (Alaska 2004)).

judgment to review questions of law.[9]  "[W]hether the expert testimony requirement of ICWA is satisfied is a pure question of law to be reviewed de novo."[10]  Whether the trial court's findings satisfy the requirements of the CINA and ICWA statutes is reviewed de novo.[11]  And "[w]hether a parent's due process right to receive effective assistance of counsel was violated is a question of law."[12]

## IV.    DISCUSSION

### A.    Harm To The Children

Before terminating parental rights to an Indian child the trial court must find "by evidence beyond a reasonable doubt, including testimony of qualified expert witnesses, that the continued custody of the child by the parent . . . is likely to result in serious emotional or physical damage to the child."[13]  Proving that a parent's custody is likely to cause a child serious harm requires showing that the parent's conduct is (1) likely to harm the child and (2) unlikely to change.[14]  The court's finding may be proved through the testimony of one or more expert witnesses or by aggregating the

---

[9]    *Ben M. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 204 P.3d 1013, 1018 (Alaska 2009).

[10]    *In re Candace A.*, 332 P.3d 578, 583 (Alaska 2014) (quoting *Christina J. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 254 P.3d 1095, 1104 (Alaska 2011)).

[11]    *See Lucy J. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.,* 244 P.3d 1099, 1111 (Alaska 2010) (citing *Carl N. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 102 P.3d 932, 935 (Alaska 2004)).

[12]    *Chloe O. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 309 P.3d 850, 856 (Alaska 2013).

[13]    25 U.S.C. § 1912(f); *see also* CINA Rule 18(c)(4).

[14]    *L.G. v. State, Dep't of Health & Soc. Servs.*, 14 P.3d 946, 950 (Alaska 2000).

testimony of lay and expert witnesses.[15]  OCS's expert testimony does not need to meet the burden of proof standing alone so long as it supports the court's conclusion.[16]

We recently clarified the role of expert witness testimony in the two-prong test, as follows:

> We have adopted a two-prong test to determine whether continued custody by the parent is likely to cause serious harm to the child.  Proof that a parent having custody is likely to cause a child serious harm requires evidence that (1) the parent's conduct is likely to harm the child and (2) the parent's conduct is unlikely to change.  We have explained that "[s]erious harm can be proved through the testimony of a single expert witness, by aggregating the testimony of expert witnesses, or by aggregating the testimony of expert and lay witnesses."  "The findings of a likelihood of serious emotional or physical damage are findings that must be made by the trial judge, not the expert witness."
>
> . . . .
>
> Although it may be best practice for expert testimony to address both prongs of the "serious emotional or physical damage to the child" test, we conclude that it is not required when the basis for termination of parental rights is culturally neutral:  so long as qualified expert testimony directly supports one prong of the substantial harm requirement and inferentially supports the other prong, the statutory requirements will be satisfied.[17]

---

[15]    *Id.*

[16]    *E.A. v. State, Div. of Family & Youth Servs.*, 46 P.3d 986, 992 (Alaska 2002).

[17]    *Diana P. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 355 P.3d 541, 546-47 (Alaska 2015) (alteration in original) (footnote omitted) (quoting *Chloe W. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 336 P.3d 1258, 1270 (Alaska 2014); *Marcia V. v. State, Office of Children's Servs.*, 201

(continued...)

### 1. Dr. Rose qualified as an ICWA expert.

Relying on expert testimony provided by Dr. Michael Rose, the trial court found beyond a reasonable doubt that Kent's continued custody would likely cause the children serious harm. Kent challenges the trial court's conclusion that Dr. Rose qualified as an expert witness under ICWA.

When determining whether a witness satisfies ICWA's "qualified expert witness" requirement, we have considered the Bureau of Indian Affairs (BIA) Guidelines for State Courts; Indian Child Custody Proceedings (1979 BIA Guidelines).[18] The 1979 BIA Guidelines were "not published as regulations because they [were] not intended to have binding legislative effect."[19] We have noted that the "guidelines are not binding, and we have departed from them in the past."[20] But we have also "looked to the BIA Guidelines for guidance."[21]

The 1979 BIA Guidelines list the types of witnesses " 'most likely' to meet ICWA's expert requirements."[22] They provide:

---

[17]  (...continued)
P.3d 496, 508 (Alaska 2009)).

[18]  44 Fed. Reg. 67,584 (Nov. 26, 1979).

[19]  *Id.* at 67,584.

[20]  *In re C.R.H.*, 29 P.3d 849, 853 (Alaska 2001) (citing *C.L. v. P.C.S.*, 17 P.3d 769, 776 (Alaska 2001); *In re Adoption of F.H.*, 851 P.2d 1361, 1364 (Alaska 1993)).

[21]  *Payton S. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 349 P.3d 162, 166 n.7 (Alaska 2015).

[22]  *In re Candace A.*, 332 P.3d 578, 583 (Alaska 2014) (quoting *Marcia V.*, 201 P.3d at 504).

Persons with the following characteristics are most likely to meet the requirements for a qualified expert witness for purposes of Indian child custody proceedings:

(i) A member of the Indian child's tribe who is recognized by the tribal community as knowledgeable in tribal customs as they pertain to family organization and childrearing practices.

(ii) A lay expert witness having substantial experience in the delivery of child and family services to Indians, and extensive knowledge of prevailing social and cultural standards and childrearing practices within the Indian child's tribe.

(iii) A professional person having substantial education and experience in the area of his or her specialty.[23]

Thus, we have concluded that an ICWA expert does not always need to have specific familiarity with Native culture. We have explained:

When the basis for termination is unrelated to Native culture and society and when any lack of familiarity with cultural mores will not influence the termination decision or implicate cultural bias in the termination proceeding, the qualifications of an expert testifying under § 1912(f) need not include familiarity with Native culture.[24]

In February 2015 — after the termination trial in this case but before the remand — the BIA adopted Guidelines for State Courts and Agencies in Indian Child Custody Proceedings (2015 BIA Guidelines) to "supersede and replace the guidelines

---

**23** 44 Fed. Reg. at 67,593.

**24** *Thea G. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 291 P.3d 957, 964 (Alaska 2013) (quoting *Marcia V.*, 201 P.3d at 503).

published in 1979."[25]  Less than a month later the BIA published proposed new ICWA regulations to "complement [the] recently published *Guidelines for State Courts and Agencies in Indian Child Custody Proceedings*."[26]  The proposed regulations have not yet been adopted.

The 2015 BIA Guidelines provide:

(a) A qualified expert witness *should have specific knowledge of the Indian tribe's culture and customs.*

(b) Persons with the following characteristics, in descending order, are *presumed* to meet the requirements for a qualified expert witness:

(1) A member of the Indian child's tribe who is recognized by the tribal community as knowledgeable in tribal customs as they pertain to family organization and childrearing practices.

(2) A member of another tribe who is recognized to be a qualified expert witness by the Indian child's tribe based on their knowledge of the delivery of child and family services to Indians and the Indian child's tribe.

(3) A layperson who is recognized by the Indian child's tribe as having substantial experience in the delivery of child and family services to Indians, and knowledge of prevailing social and cultural standards and childrearing practices within the Indian child's tribe.

(4) A professional person having substantial education and experience in the area of his or her specialty *who can demonstrate knowledge of the prevailing social and cultural*

---

[25]     Guidelines for State Courts and Agencies in Indian Child Custody Proceedings, 80 Fed. Reg. 10,146, 10,147 (Feb. 25, 2015).

[26]     Regulations for State Courts and Agencies in Indian Child Custody Proceedings, 80 Fed. Reg. 14,880, 14,880 (Mar. 20, 2015).

*standards and childrearing practices within the Indian child's tribe.*

*(c) The court or any party may request the assistance of the Indian child's tribe or the Bureau of Indian Affairs agency serving the Indian child's tribe in locating persons qualified to serve as expert witnesses.*[27]

Relying on the 2015 BIA Guidelines, Kent argues that the trial court erroneously concluded that Dr. Rose was a qualified expert witness under ICWA because Dr. Rose "is not a member of the children's tribe or of any tribe, and has no experience or expertise providing services to the children's tribe or any tribe." Kent asserts that Dr. Rose could not be qualified as an expert because Dr. Rose did not fall into any category enumerated.

Assuming that the 2015 BIA Guidelines envision that all ICWA experts exhibit familiarity with Alaska Native or tribal culture, we have noted that the BIA Guidelines are not binding.[28] And as explained above, we have not required that ICWA experts exhibit familiarity with Alaska Native culture when the basis for termination does not implicate cultural bias.[29] OCS argues that "because the BIA is in the process of adopting ICWA regulations whose final content is unknown, it would be premature for this court to consider overturning Alaska law on ICWA experts before knowing what the BIA's final word on qualified experts is." We agree. Final regulations have not yet been adopted and we thus cannot determine whether they will include such a requirement in

---

[27]    Guidelines for State Courts and Agencies in Indian Child Custody Proceedings, 80 Fed. Reg. at 10,157 (emphases added).

[28]    *In re C.R.H.*, 29 P.3d 849, 853 (Alaska 2001) (citing *C.L. v. P.C.S.*, 17 P.3d 769, 776 (Alaska 2001); *In re Adoption of F.H.*, 851 P.2d 1361, 1364 (Alaska 1993)).

[29]    *Thea G.*, 291 P.3d at 964 (quoting *Marcia V.*, 201 P.3d at 503).

the future. We decline to overrule our longstanding precedent based on the possibility that BIA regulations will require a different result in the future.

## 2. Dr. Rose's testimony was based on facts specific to this case.

Kent next argues that Dr. Rose's testimony was generalized and failed to address the particular facts of his case. Relying on our decision in *C.J. v. State, Department of Health & Social Services*,[30] Kent argues that Dr. Rose's testimony is not sufficient because he never had contact with the children, failed to give testimony regarding the children's suffering, and his conclusions were generalizations. In *C.J.* we concluded that an expert's testimony was insufficient because the expert had no contact with the parent or the children, the expert's conclusions "provide[d] little discussion of the particular facts of th[e] case," and when considered together with other evidence in the case was insufficient to establish beyond a reasonable doubt that returning the children to the parent would likely result in serious harm.[31]

But "[o]ur case law is clear that in-person meetings are not required and the requirement for expert testimony is that it support the ultimate conclusion."[32] And we have explained that when evaluating the sufficiency of an ICWA expert's testimony, "[t]he issues are whether the expert disregarded or was unaware of contrary evidence, and whether the testimony was so vague and generalized that the trial court clearly erred in according weight to it."[33] Applying this standard there is no contrary evidence in the

---

[30]    18 P.3d 1214 (Alaska 2001).

[31]    *Id.* at 1218-19.

[32]    *Ben M. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 204 P.3d 1013, 1020 (Alaska 2009).

[33]    *Id.*

record that Dr. Rose disregarded. And despite Kent's assertions Dr. Rose's testimony was not vague and generalized.

Dr. Rose met with and evaluated Kent. Dr. Rose testified based on his evaluation that Kent had problems with anger and domestic violence, that he had committed domestic violence in front of his children, and that there was a risk that his abuse and neglect would continue into the future. This testimony was at least partially based on Kent's statements and performance during his psychological evaluation. And Dr. Rose's testimony was clear and directed at Kent's behaviors and problems. We therefore conclude that Dr. Rose's testimony was sufficient.

**3. Dr. Rose's testimony alone did not have to establish a causal connection between Kent's conduct and the likelihood of harm to his children.**

Kent also asserts that "Dr. Rose plainly did not provide the court with evidence (much less evidence beyond a reasonable doubt) that continued custody by [Kent] would in fact result in serious harm to the Indian children in this case." To support his argument Kent quotes the 2015 BIA Guidelines for the requirement that "evidence must show a causal relationship between the existence of particular conditions in the home that are likely to result in serious emotional or physical damage to the particular child who is the subject of the proceeding."[34] But even were we to adopt and apply the 2015 BIA Guidelines to this case, Kent fails to establish that the guidelines necessarily require that such a causal connection must be shown by expert testimony.

"ICWA requires that the trial court find 'by evidence beyond a reasonable doubt, including testimony of qualified expert witnesses, that the continued custody of the child by the parent . . . is likely to result in serious emotional or physical damage to

---

[34] Guidelines for State Courts and Agencies in Indian Child Custody Proceedings, 80 Fed. Reg. 10,146, 10,156 (Feb. 25, 2015).

the child.' "[35]  We have adopted a two-prong test to satisfy this requirement:  A trial court's finding must be based on "evidence that (1) the parent's conduct is likely to harm the child and (2) the parent's conduct is unlikely to change."[36]  A court's finding may be based on a single expert witness "or by aggregating the testimony of expert and lay witnesses."[37]  Qualified expert testimony does not need to support both prongs of the analysis:  "so long as qualified expert testimony directly supports one prong and inferentially supports the other prong, the statutory requirements will be satisfied."[38]

Dr. Rose's testimony directly supports the conclusion that unless Kent made progress in recommended services his conduct was unlikely to change.  And Dr. Rose's testimony and report at a minimum support an inference that Kent's children will suffer harm if returned to his care.  Dr. Rose explicitly noted that Kent's children were at risk of abuse or neglect and that Kent's aggressive behavior could lead to aggression in his children.

Because Dr. Rose's testimony directly supports one prong of our test and inferentially supports the other, we conclude that Dr. Rose's testimony satisfied ICWA's requirement for qualified expert testimony.

---

[35] *Diana P. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 355 P.3d 541, 546 (Alaska 2015) (alteration in original) (quoting 25 U.S.C. § 1912(f)).

[36] *Id.*

[37] *Id.* (quoting *Chloe W. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 336 P.3d 1258, 1270 (Alaska 2014)).

[38] *Id.* at 547.

**4.** **The evidence in the record supports the trial court's decision to terminate Kent's parental rights because it establishes a connection between Kent's conduct and the likelihood of future harm to his children.**

Kent argues that the trial court's findings are not supported by evidence in the record and fail to connect his behavior to harm suffered by the children. Kent asserts that there was only one specific incident of domestic violence introduced in this case. And Kent notes that at a probable cause hearing the trial court admonished OCS for not providing more detail of the alleged incident. Kent also argues that although there was evidence he used cocaine, there was no correlation shown between his cocaine use and harm to his children.

Kent faults the trial court for finding that his home was extremely chaotic when no concrete evidence was presented regarding the state of his home, and Kent asserts that there was limited evidence supporting the trial court's findings that the children were troubled. Finally, Kent asserts that "the court's findings do not connect the articulated deficiencies in [his] parenting with the harm which the court found to have occurred, to be likely to occur and to be certain to occur."

The trial court's findings are not clearly erroneous. The court received evidence of Kent's violent and aggressive behavior, and the court heard testimony that the children were also exhibiting violent behavior. Kent does not deny his involvement in domestic violence incidents and does not argue either that being exposed to domestic violence is not harmful to children or that it does not subject them to risk of harm. And Kent ignores evidence in the record that he behaved inappropriately with his children and that these behaviors caused the children stress. The court also heard Dr. Rose's testimony, based on an in-person meeting and evaluation, that Kent's behavior was exacerbated by his substance issues and that Kent was likely to put his children at risk in the future.

Because evidence in the record supports the trial court's findings that the children suffered harm and that returning the children to Kent's care would likely lead to future harm, we affirm the court's findings.

## B.    Active Efforts

Before the trial court may terminate parental rights to an Indian child, 25 U.S.C. § 1912(d) and CINA Rule 18(c)(2) require the court to find by clear and convincing evidence that OCS made active, but unsuccessful, efforts to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family. Trial courts must review the adequacy of OCS's reunification efforts on a case-by-case basis because "no pat formula exists for distinguishing between active and passive efforts."[39] Active efforts generally entail a social worker taking a parent through the steps of a reunification case plan, rather than simply devising a plan and requiring the parent to develop the necessary resources.[40] In determining whether OCS made active efforts, the trial court may consider all services provided during the family's involvement with OCS, rather than focus on a distinct period of time.[41]

The trial court found by clear and convincing evidence that OCS made active efforts to prevent the breakup of Kent's family. The court noted that OCS provided Kent "every opportunity to try to change and improve and become a safe father

_____

[39]    *A.A. v. State, Dep't of Family & Youth Servs.*, 982 P.2d 256, 261 (Alaska 1999) (quoting *A.M. v. State*, 945 P.2d 296, 306 (Alaska 1997)) (internal quotation marks omitted).

[40]    *Lucy J. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.,* 244 P.3d 1099, 1114 (Alaska 2010).

[41]    *Sandy B. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 216 P.3d 1180, 1188-89 (Alaska 2009); *Maisy W. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 175 P.3d 1263, 1268-69 (Alaska 2008).

and parent for these children." And the record is replete with evidence to support the court's finding: OCS created a safety plan to allow the children to remain in Kent's home; set up urinalysis; provided referrals for a substance abuse assessment, parenting classes, and a psychological evaluation; helped Kent search for stable housing; consistently reminded Kent that time was of the essence and encouraged him to participate in his case plan; and requested that the court delay the termination trial after Kent showed some progress on his case plan's goals.

Kent does not dispute or challenge the extent of OCS's efforts. Instead, again relying on the 2015 BIA Guidelines,[42] Kent argues that OCS failed to make active efforts because "no matter how significant the efforts OCS makes to provide services to a Native family, if they fail to incorporate the Native community, those efforts cannot be sufficient to justify the termination of parental rights of a Native child."

The 2015 BIA Guidelines provide: "Active efforts must be documented in detail and, to the extent possible, should involve and use the available resources of the extended family, the child's Indian tribe, Indian social service agencies and individual Indian care givers."[43] This language is substantially similar to the 1979 BIA Guidelines which provided: "These efforts shall take into account the prevailing social and cultural conditions and way of life of the Indian child's tribe. They shall also involve and use the available resources of the extended family, the tribe, Indian social service agencies and individual Indian care givers."[44]

---

[42] Guidelines for State Courts and Agencies in Indian Child Custody Proceedings, 80 Fed. Reg. 10,146, 10,147, 10,156 (Feb. 25, 2015).

[43] *Id.* at 10,156.

[44] 44 Fed. Reg. 67,584, 67,592 (Nov. 26, 1979). In fact, the 1979 BIA Guidelines more explicitly encourage the use of Native resources, and did not include
(continued...)

OCS persuasively notes that "Kent does [not] identify any particular therapy or service he believes OCS should have provided him, nor does he dispute the degree of effort [OCS] made on his behalf." And when applying the 1979 BIA Guidelines we never have concluded that an active efforts finding must include a determination that OCS involved and used available Native resources. Rather, we have emphasized that "no pat formula exists for distinguishing between active and passive efforts,"[45] and noted that "[w]hether OCS made active efforts is determined on a case-by-case basis."[46] Absent a credible argument that OCS's failure to provide Kent a specific Native-based service materially contributed to his failure to remedy, his active efforts argument has no support.

We see no reason to change course at this time and impose a strict requirement that active efforts always include Native resources, particularly because the BIA's regulations on this matter are not yet final. And we will continue to review the sufficiency of OCS's efforts on a case-by-case basis. We therefore conclude that the trial court did not clearly err in finding that OCS made active efforts.

C.    **Collateral Challenge**s

1.    **The trial court did not err when removing Kent's children.**

Kent argues that the trial court erred early in the case when it concluded that the Tribe's notice of intervention and supporting document were insufficient to establish

---

**44**    (...continued)
the caveat that these resources should be used "to the extent possible."

**45**    *Jon S. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 212 P.3d 756, 763 (Alaska 2009) (quoting *A.A. v. State, Dep't of Family & Youth Servs.*, 982 P.2d 256, 261 (Alaska 1999)).

**46**    *Lucy J. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 244 P.3d 1099, 1114 (Alaska 2010).

Casey's tribal membership. He asserts that a trial court cannot ignore "less than clear" evidence that ICWA applies to a case, and must instead make an independent determination whether ICWA should apply. Kent also argues that "a conclusive determination by the Tribe" is not a prerequisite for ICWA to apply, and that the trial court had an affirmative obligation to determine whether ICWA should have applied. Kent finally argues that after initially taking the position that ICWA applied in this case, OCS cannot take a conflicting position on appeal and argue that the trial court correctly decided ICWA did not apply.

Kent's final argument directly conflicts with our precedent. OCS is precluded from "arguing a new position on appeal contrary to a position [it] had taken in the superior court on an issue not raised to or decided by that court."[47] The issue whether the children were Indian children was specifically addressed by the trial court in this case and "there was no evidence nor specific concession by [OCS] that the Tribe had determined [the children were] member[s] or eligible for membership in the Tribe."[48] At times during this case OCS expressed the belief that the children were Indian children, but OCS never asserted that the Tribe had determined the children's status or eligibility. Thus OCS is not precluded from arguing that the trial court correctly determined that ICWA should not apply at the time of removal.

Kent's earlier arguments are also flawed. We have explained that in circumstances when a child's tribal status is unknown, a trial court will have to independently determine whether the child is an Indian child.[49] But the burden of producing the evidence to establish that a child is a member or eligible for membership

---

[47]    *Bruce L. v. W.E.*, 247 P.3d 966, 976 (Alaska 2011).

[48]    *Id.* at 977.

[49]    *Id.* at 975-77.

in a tribe falls on the party asserting ICWA's applicability.[50] In this case the trial court considered ICWA's applicability and encouraged the Tribe to submit clear and admissible evidence and intervene. Ultimately neither the Tribe nor Kent submitted any evidence before removal establishing that ICWA applied. While there was evidence throughout the case below that Casey was — and therefore the children were — Alaska Native, there was no clear evidence that the children were Indian children under ICWA. We therefore conclude that the trial court did not err when it removed the children and did not apply ICWA.

And as OCS persuasively argues, "[a]ny error in the removal proceeding does not invalidate the separate termination proceeding." OCS notes that "any error in failing to make ICWA-required findings at the removal stage was cured at the termination phase." OCS emphasizes that the findings required for termination are more rigorous than the findings required for removal,[51] and OCS explains that the "theoretical possibility of prejudice" is not enough to reverse the termination decision.[52] Kent appears to concede that errors in removal will be cured by a proper termination, but only if the subsequent termination "was proper pursuant to ICWA." As explained above, the trial court correctly applied the law and the termination decision was supported by evidence in the record. Thus any error in the trial court's decision to remove Kent's children was cured by the court's subsequent termination decision.

---

[50]    *Id.* at 977.

[51]    *Compare* 25 U.S.C. § 1912(e) (requiring clear and convincing evidence), *with* 25 U.S.C. § 1912(f) (requiring evidence beyond a reasonable doubt).

[52]    *Payton S. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 349 P.3d 162, 169 (Alaska 2015).

## 2.      Kent  did not receive ineffective assistance of counsel.

We have explained that "[e]ffective assistance of counsel in parental rights termination proceedings is a constitutional right."[53]  We apply a two-prong test to review ineffective assistance of counsel claims:

> Under the first prong, the litigant must show that her attorney's performance was below a level that any reasonably competent attorney would provide, bearing in mind that "reasonable tactical decisions are virtually immune from subsequent challenge even if, in hindsight, better approaches could have been taken."  Under the second prong, the litigant must demonstrate that counsel's improved performance would have affected the outcome of the case.[54]

Kent asserts that he received ineffective assistance of counsel at trial because his lawyer failed to raise ICWA and "failed to call a single witness other than [Kent] in support of [Kent's] case."  Kent also argues that "clearly, neither removal nor termination would have been the result if ICWA was applied (as it should have been) to the case at bar."

But any prejudice Kent suffered when the trial court terminated his parental rights without applying ICWA  was cured after the trial court applied ICWA on remand.  Kent's parental rights eventually were terminated under ICWA, and as explained above, we affirm the trial court's decision to terminate his parental rights.  Additionally, applying ICWA cured any prejudice Kent may have suffered from his original trial counsel's failure to argue for ICWA during the removal proceedings because the termination findings were more rigorous than the findings necessary for removal.  Finally, Kent fails to establish that his former lawyer's decision to call only one witness

---

[53]      *Chloe W. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 336 P.3d 1258, 1266 (Alaska 2014).

[54]      *Id.* at 1265 (footnote omitted) (quoting *Chloe O. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 309 P.3d 850, 858-59 (Alaska 2013)).

was not a tactical decision, and he fails to explain how the testimony of additional witnesses would have affected the outcome of his termination trial.

## V.    CONCLUSION

We AFFIRM the trial court's decision terminating Kent's parental rights to his three children.